THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DOMINIC PILOTTI, Appellant.

First Department, February 5, 1987

## APPEARANCES OF COUNSEL

*Jay Goldberg* for appellant.

*Cindy Rainbow* of counsel *(Mark L. Freyberg* with her on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

FEIN, J.

This is an appeal from an order of the Supreme Court, Bronx County (Lawrence Tonetti, J.), entered October 21, 1985, denying defendant's motion to vacate the judgment of conviction and 2½- to 5-year sentence as a second violent felony offender, rendered against him on April 3, 1978, on his plea of guilty to criminal possession of a weapon in the third degree (Manuel Ramos, J.). The sentence was to be served concurrently with an 11- to 22-year sentence on defendant's June 6, 1977 conviction on a plea of guilty to manslaughter in the first degree (Max Bloom, J.).

Defendant was arrested on April 9, 1977, along with Alfred Peruso and Louis Giongetti. Defendant and Giongetti were each booked for the murder of Jose Melendez, a drug dealer, and for possession of a weapon. The homicide had occurred an hour to an hour and a half prior to the arrests. Individuals in one vehicle had been observed shooting at the occupants of another vehicle. The police were furnished with the license plate number of the getaway vehicle, and traced its owner to a Bronx address. The police staked out the address, and after a period of time they observed defendant, Giongetti and Peruso leaving the building. Defendant entered a taxi. The other two departed in the opposite direction.

When defendant entered the taxi, he was carrying a coat over his arm. As a police officer approached and ordered defendant out of the cab, defendant reached for the coat. The officer directed defendant to leave the coat. The officer then went to the cab, lifted out the coat and discovered underneath it a .357 Magnum Colt revolver wrapped in a towel. Giongetti and Peruso were also arrested and a gun was found in Giongetti's possession. Although defendant was booked for murder and weapons possession, he was indicted in 1977 only for possessing the .357 Magnum which was found in the cab.

On February 28, 1978, following denial of defendant's suppression motion, he pleaded guilty to criminal possession of a

weapon in the third degree, admitting that he possessed the loaded .357 Magnum. He was sentenced as promised to a term of from 2½ to 5 years, to run concurrently with his sentence of 11 to 22 years previously imposed by Justice Bloom upon defendant's conviction on a plea of guilty to manslaughter in the first degree for the killing of Wilfredo Figueroa.

On his prior appeal of the weapons possession conviction, defendant challenged only the pretrial denial of his motion to suppress the gun. This court unanimously affirmed his conviction without opinion on December 20, 1979, *sub nom. People v Dominick Pilotto* (73 AD2d 846, *lv denied* 49 NY2d 895, *cert denied sub nom. Pilotti v New York,* 449 US 870).

At the hearing on defendant's motion to vacate the judgment and sentence based upon his guilty plea to weapon possession, which is the subject of this appeal, defendant and his two prior attorneys, Lawrence Dubin and Murray Richman, testified. Dubin, who had represented defendant after his April 1977 arrest for the Melendez homicide and for criminal possession of a weapon, testified that he had moved to suppress the .357 Magnum and to dismiss the possession indictment, and made discovery motions. He testified that he and defendant had frequently discussed the possible connection between the weapon found in the taxicab and the Melendez homicide, and that determining whether such a link existed was "top of his [i.e., defendant's] list."

Two DD-5 police reports regarding the Melendez homicide which had been furnished to Dubin, dated April 14 and 15, 1977, were received in evidence. Neither established a connection between defendant's gun and the homicide. Actually, the April 15 report stated that Detective Simmons of the Ballistics Unit "Believes all bullets and shells recovered [were] used from guns *other than* the two recovered" (emphasis supplied). Dubin testified that he was affirmatively told by the Assistant District Attorney that no connection had been established between the gun and the Melendez homicide.

However, a third ballistics report, apparently dated June 2, 1977, concluded that the "bullet from deceased matched bullet fired from Pilettis *[sic]* gun." Dubin stated that he never received a copy of this report, although it was discoverable under CPL 240.10 and 240.20 (1) (c). Dubin asserted that it was the withholding of this critical evidence, combined with the contents of the reports disclosed and statements made by the Assistant District Attorney, which led him and defendant

to believe no link had been established between defendant and the Melendez homicide. Dubin testified that he never would have recommended that defendant plead guilty on the gun charge had he been aware of the withheld report. Defendant testified to the same effect.

Richman testified that while preparing for the Melendez murder trial, which was to start October 27, 1980, both defendant and Dubin told him they had been informed that no link existed between defendant and the Melendez homicide. Richman testified that he and defendant first learned of the ballistics match in October 1980, upon being given notice that the People intended to introduce defendant's plea allocution on their direct case. Richman's motion to suppress the statement was denied.

The Assistant District Attorney who presented the People's case at the *Mapp* hearing on the gun possession charge and at the entry of defendant's guilty plea for gun possession after denial of the motion to suppress was not the one originally assigned to the case.

At the hearing subject of this appeal, he asserted that he understood, from his discussions with the Assistant District Attorney originally assigned to the case and Dubin (defendant's lawyer), that defendant's gun was connected with a homicide. He further asserted that in plea discussions it was made clear that defendant could plead guilty to possession of the gun and receive a sentence of 2½ to 5 years, concurrent with the 11- to 22-year term imposed by Justice Bloom for the Figueroa homicide, or he could receive 2½ to 5 years to run consecutively with the 11- to 22-year term if he wished the plea to cover the Melendez homicide for which he had not been indicted. The later assigned Assistant District Attorney testified that defendant chose the first alternative because "They don't have me and they never will have me and I am not going to be involved even for saying it is being covered." He claimed that he made no representations to Dubin as to any link between the gun and the homicide. However, he admitted that he did not give Dubin a copy of the June 2, 1977 DD-5 report which established the link. He asserted that Dubin had indicated his awareness that the gun was so connected.

In a memorandum to his bureau chief, dated March 2, 1978, which was after defendant's guilty plea but prior to sentence, he asserted that defendant originally "did not wish to plead

solely to the gun charge without covering an unindicted homicide". The memo added that "Although the attorney agreed" to the offer of consecutive time, "his client did not wish the unindicted homicide to be covered", but would plead if concurrent time was offered. The memo concluded with the statement that the People might have a problem if defendant were indicted for the homicide without obtaining evidence additional to what they already had: "Good faith and the argument that we attempted to prove the homicide b[y] bootstrapping the gun charge may very well be a case of first impression in this State."

The People also introduced into evidence the transcript of the June 6, 1977 sentencing proceeding before Justice Bloom on the Figueroa homicide. Defendant had pleaded guilty to manslaughter in the first degree on April 15, 1977. In an effort to convince Justice Bloom to permit him to withdraw his plea, he asserted, among other things, that he had been unfairly harassed by prosecutors. He related alleged threats and false claims made by the People regarding the Melendez investigation at the time of his original arrest. He told Justice Bloom that the prosecutors, in order to induce a plea in the unrelated Melendez homicide, had told him that the gun matched the bullets involved in the Melendez shooting, despite the fact that later events, the April DD-5 reports and his attorney's information revealed this had not been true:

"THE DEFENDANT: It isn't a lie. It's a fact. I could bring my— I could bring my prior attorney here to prove it. He told me— [the originally assigned Assistant District Attorney] told me that 'they caught you with a gun in your belt and that you're going to get twenty-five to live [sic]. You got the ballistics from Jose Melendez, matched with the gun that they found in the belt' when, in fact, I wasn't indicted for the case. Jose Melendez had nothing to do with this case and he told me, 'I think you should take this plea because I could get it all covered together.' He told me I was guilty. I didn't get indicted for the case. I was threatened to take the plea.

"THE COURT: You're talking about something that's not before me and I don't care what happened in that case.

"THE DEFENDANT: They brought it up. They brought it up. He said I was lying. I ain't lying. I could prove it."

The People asserted that this excerpt proved that defendant knew of the ballistics link. The defense argues that this clearly misinterprets the statement which was made on June

6, 1977 before Justice Bloom with respect to the Figueroa homicide.

It is notable that the Assistant District Attorney originally assigned to the case and the bureau chief were present on behalf of the People when defendant made this statement to Justice Bloom. Nothing was said by them about the June 2, 1977 ballistics report, the only link to defendant's gun. It is noted that the hearing court's decision in our case inaccurately quoted defendant as saying "He told me * * * [the Assistant District Attorney later assigned] told me that they caught you with the gun in your belt and that you're going to get 25 to life." The transcript, which is part of the record, quotes defendant as referring to the Assistant District Attorney originally assigned, as above indicated.

It is plain that defendant was referring to threats allegedly made before the withheld ballistics report even existed, threats made at a time when the link had not been established. It is also undisputed that no gun was ever found in defendant's belt.

Nonetheless, Criminal Term accepted the later assigned Assistant District Attorney's testimony that this statement by defendant was proof that defendant knew the link had been established. Criminal Term did not comment on the order of events or the withholding of the June 2 ballistics report, but concluded that defendant's statements to Justice Bloom indicated that defendant "knew that the gun matched the ballistics evidence that they had from the deceased". It is notable that there was no disclosure during the Figueroa sentence proceedings before Justice Bloom on June 6, 1977, that there had been a ballistics report rendered four days earlier linking defendant's gun to the Melendez homicide. Nonetheless, Criminal Term found as a fact, in reliance on this statement by defendant, that he knew there was a ballistics tie of the gun to the Melendez homicide. Thus it ruled, as a matter of law, that there was no fraud or misrepresentation and denied defendant's motion to withdraw the plea in this case.

It is palpable that defendant's plea was invalid and that the hearing court's contrary finding was in error. The suppression or withholding of the June 2 DD-5 report clearly misled defendant.

CPL 440.10 (1) provides, in part:

"At any time after the entry of a judgment, the court * * * may * * * vacate such judgment upon the ground that * * *

"(b) The judgment was procured by duress, misrepresentation or fraud on the part of the court or a prosecutor or a person acting for or in behalf of a court or a prosecutor".

As stated by the Court of Appeals in *People v Picciotti* (4 NY2d 340, 344), "There can no longer be doubt that *coram nobis* lies to correct a judgment 'based upon trickery, deceit, coercion or fraud * * * in the procurement of the plea' * * * '[T]o deny a person an opportunity to be heard on proof that he was defrauded or coerced into pleading guilty to a crime would impair a constitutional right'." (Quoting from *Matter of Lyons v Goldstein*, 290 NY 19, 25-26; *see, Brady v United States*, 397 US 742, 757.)

Although factual findings by the hearing court are not to be lightly discarded, plainly unjustified or clearly erroneous findings are not to be accepted *(People v Quinones,* 61 AD2d 765). The principle is well stated in *People v Lopez* (95 AD2d 241, 252-253): "In reviewing a factual determination based largely upon an assessment of credibility, the determination of the trier of facts is ordinarily accorded great weight * * * However, this rule of deference must give way when the appellate court determines that the fact findings under review are against the weight of the evidence * * * which is itself a factual determination *(Cohen v Hallmark Cards,* 45 NY 2d 493). If the determination is made after a Bench trial and the Appellate Division finds that the trier of fact incorrectly assessed the evidence, the Appellate Division has the power to make new findings of fact (CPL 470.15, subd 1 * * *). Weight of evidence analysis involves a discretionary balancing of many factors based upon the court's commonsense reaction to the evidence, in light of its collective experience * * * If a different finding from that of the trial court is not unreasonable, then this court must weigh the relative probative force of conflicting testimony and the relative strength of any inferences that may be drawn from such testimony".

It is obvious that defendant and his experienced attorney had concluded, as they surely must have, that defendant, by pleading guilty, would not be admitting possession of a weapon that would provide the only nexus between himself and the Melendez homicide. Especially significant is the language in the April 15, 1977 DD-5 report: "Det. Simmons Ballistics unit * * * [b]elieves all bullets and shells recovered used from guns other than the two recovered." The April 14 report similarly did not link the gun to the murder. The June

2, 1977 DD-5 report, which asserted the link, was never disclosed until the Melendez murder trial.

It is notable that the 1977 indictment was only for possession of the .357 Magnum. The indictment for the Melendez homicide did not come until two years later.

Based on this evidence and discussions with the prosecution, defendant and his attorney were assured in 1977 that no link had been established between the gun and the Melendez homicide. Nevertheless, the hearing court relied heavily on the testimony to the contrary of the Assistant District Attorney later assigned, albeit acknowledging that defendant's attorney, Dubin, was a long-time and well-experienced criminal attorney. If his testimony is credited as to his conversations with Dubin, it is incredible that Dubin said nothing on the record at the weapons plea to protect himself from a future claim of ineffectiveness. It is inexplicable why any criminal defendant or any attorney, experienced or not, would provide the grounds for a murder indictment, which would be the case if either knew a link between the gun and the homicide had been established. They simply were not provided with a copy of the June 2, 1977 ballistics report.

It is also unexplained why the People were so quick to allow the plea to possession of a loaded weapon with the understanding that the sentence would be concurrent to a sentence imposed by Justice Bloom for an earlier homicide if they knew, as the later assigned Assistant District Attorney's memorandum stated, that the only evidence available was merely "Good faith and the argument that we attempted to prove the homicide b[y] bootstrapping the gun charge".

It is notable that the People's answering papers on defendant's motion asserted only that defendant did not rely on the lack of evidence linking the weapon to the murder, and argued only that the withheld ballistics report was not discoverable. However, at the hearing, the testimony of the later assigned Assistant District Attorney, claiming that defendant had been informed of the connection, was relied upon.

The hearing court also believed that the proceedings before Justice Bloom evidenced defendant's knowledge of the ballistics link. I suggest that the only fair reading that can be given to the statements by defendant is that he claimed he had been deliberately misled, without basis, by the Assistant District Attorney. Surely he had to have a basis for his statement before Justice Bloom. The alternatives suggested in the dis-

sent are pure speculation. Defendant made the statement before Justice Bloom. It was relied upon in the decision of the hearing court, now on appeal, which the dissent concedes was erroneous. It is also notable that the ballistics report linking the gun to the Melendez homicide did not come into existence until almost seven weeks after the plea in the Figueroa case was taken before Justice Bloom on April 15, 1977, and four days before the sentence was imposed on June 6, 1977.

The facts and the credible evidence permit only one conclusion. Defendant was misled by the withholding of a critical, discoverable document. Its contents were never disclosed prior to his plea to weapons possession. Defendant was lured into the plea by such conduct. The conclusion of the hearing court adopts the patently incredible position that defendant, a criminal with long experience, and his attorney, a lawyer of great experience, would agree to the plea knowing that it would provide the only link to a homicide indictment.

Such a finding need not be followed upon appeal (People v Bezares, 103 AD2d 717). As recently observed by Judge Kaye, writing for a unanimous Court of Appeals in People v Thomas (68 NY2d 194, 199), "[I]t is * * * plain that a declarant would rarely consent to a plea bargain if it did not in some sense also serve his or her penal interests."

The plea here served no such interest. It was actually used against defendant's penal interest on the subsequent Melendez trial. There the prosecution agreed not to use defendant's admission unless he took the stand and denied possession. This result was plainly to be anticipated when he took the plea. Equally plain is the conclusion that he would never have taken the plea and made the concomitant admission had the existence of the link been made known.

The dissent concedes that there is no basis in the record for the findings of the hearing court that defendant and his lawyer knew, at the time of the plea, that the gun had been ballistically connected with the Melendez homicide and that this had been made known to them by the District Attorney. On June 7, 1977, in connection with defendant's unsuccessful motion to withdraw his plea in the Figueroa case, he asserted that prior to the plea in that case the Assistant District Attorney stated that defendant had been caught with a gun in his belt, which had been ballistically connected with the Melendez homicide. It is clear, as the dissent concedes, that the District Attorney's office did not learn of the gun's ballis-

tic connection to the Melendez homicide until almost two months after the statement attributed to the Assistant District Attorney.

It is plain that prior to the Figueroa sentence proceeding assertions had been made by an Assistant District Attorney to defendant or to his lawyer at the time that there was such a connection, albeit there was then no such evidence. As has been noted, it is equally plain that there was never any evidence that defendant had been caught with a gun in his belt. The only weapon tied to defendant was the gun found under his coat on the seat of the taxicab.

The hearing court's reliance on this statement by defendant, as a foundation for its determination, is conceded by the dissent to have been erroneous. However, the dissent ignores the pertinent point that defendant and his lawyer were misled, deliberately or not, in a manner which ultimately succeeded in misleading the hearing court. The plain fact, conceded by the dissent, is that all of the findings of the hearing court are without basis in the record.

The dissent attempts to overcome these errors by undertaking what it describes as "a de novo examination of the record * * * to make new findings."

The dissent then goes through an analysis of the events and speculates at length as to what was said and thought by defendant, his lawyer and the District Attorney. In the course of that analysis, the dissent concludes that "when the case was presented to the Grand Jury, the District Attorney did not know that the gun, for the possession of which Pilotti had been indicted, was ballistically connected with the Melendez homicide."

The dissent further concedes the central issue now here: "From a study of the hearing record, it is clear that the defendant, and his counsel, did not in fact know at the time the plea was entered, that the gun had been ballistically matched to the Melendez homicide."

The dissent also properly finds merit in the contention of defendant and his lawyer that they were misled because the lawyer received two DD-5s (police reports) dated April 14 and April 15, 1977, reporting no ballistics connections had been found, and because of the failure of the District Attorney to turn over to defense counsel the June 2, 1977 DD-5 reporting that defendant's gun matched a bullet found in the body of Melendez. Whether the failure to turn that report over was

purposeful or deliberate is not dispositive, despite the contention to that effect in the dissent.

It is not necessary to deal with the repeated assertion that vacatur of the plea would be unfair to the Assistant District Attorneys involved. It is necessary only to determine whether their actions misled defendant, which the dissent plainly concedes. This is the problem with which we must deal.

Nor need we explore what course the defense lawyer would have taken had he known the facts. The hearing court concluded that the lawyer knew the facts and allowed the plea to stand because of that. The District Attorney, in arguing this case before the hearing court and before this court, has persisted in the position that the lawyer had such knowledge. Such a conclusion requires a determination that a highly qualified defense lawyer was totally incompetent in advising his client in this case and failed to make a record of his reasons for doing so. This is best demonstrated by the following quote from the dissent, which concedes that the defense lawyer was never apprised of the ballistics test result: "What makes the defense thesis even more implausible is the reality that from the standpoint of the alternative plea bargain proposed by the District Attorney's office to defendant, it was important to the District Attorney that the defendant and his counsel know that Pilotti's gun was ballistically connected to the Melendez homicide. The proposed plea bargain was in the alternative—2½ to 5 years to run consecutively to the Figueroa sentence if the plea covered the Melendez homicide, and 2½ to 5 years to run concurrently with that sentence if it did not."

How this squares with the concession by the dissent that at the time of the plea neither defendant nor his lawyer knew of the gun connection does not appear. There is a plain contradiction between the testimony of defense counsel Dubin and the Assistant District Attorney later assigned before the hearing court. The Assistant District Attorney testified that Dubin made it clear that he knew that defendant's gun had been ballistically connected. Dubin testified that the Assistant District Attorney explicitly told him that there was no report establishing a ballistics connection between the gun and the homicide.

The dissent seeks to shake Dubin's credibility by referring to his inaccurate recollection that his client's plea included a consecutive 2½- to 5-year sentence, and his failure to recall

the alternative plea bargain offered by the District Attorney. It is notable that on the second day of Dubin's testimony he indicated the reason that he had erred in his prior testimony. As to whether the later assigned Assistant District Attorney had made an explicit statement to Dubin, reference need only be made to his own testimony, quoted in the dissent to support its contention that he had relied upon Dubin's assertion of knowledge: "Once he told me that. Mr. Dubin told me that, outside Part 19, because he was concerned that Mr. Pilotti would not be covered in the unindicted case and he was concerned with that and he kept urging him to do it, strike the best plea bargain because that was the thing to do and Mr. Pilotti would not go along for whatever reason, and so Mr. Dubin told me this your honor. I didn't have to tell him. He told me this, that he was aware of it and he knew that if we ever came up with this witness—I don't know if he knew who the witness was or not—that we could ultimately indict him, which apparently did happen." The dissent concession that Dubin did not know plainly shakes the credibility of this testimony by the later assigned Assistant District Attorney.

The dissent overlooks the Assistant District Attorney's testimony at another part of the record:

"Q. Is it fair to say that you viewed the prosecution of Pilotti for the murder as yet unindicted would be advanced if he would plead guilty to the gun; is that a fair statement?

"A. Yes.

"Q. And you had discussions with [the originally assigned Assistant District Attorney] did you not, with respect to how it would advance the case and the cause of justice if you could bring Pilotti into a firm connection to that weapon, is that right, in a Court of Law?

"A. Absolutely."

Further,

"Q. You knew, as an assistant DA, that there was a report acknowledging that the gun which allegedly was possessed by Pilotti was the actual murder weapon that was used to kill Malendez [sic]; you knew that, didn't you?

"A. That there was such a report?

"Q. That there was such a report.

"A. I knew that? I don't know.

"Q. Can you answer that?

"A. I don't know. I don't know if there was a report. I

cannot say that I knew that because there was a report, but I do know that was told to me.

"Q. By?

"A. Either told to me by * * * [the Assistant District Attorney originally assigned to the matter or the bureau chief] or both.

"Q. Did you tell that to Dubin that there was?

"A. Dubin told me that.

"Q. Dubin told you?

"A. Yes.

"Q. That he had a client who has [sic] yet was unindicted for murder?

"A. Yes.

"Q. But he was willing to plead him guilty to the very weapon that he knew tied him into this as yet unindicted murder; is that what he told you?

"A. No. He did not want him to plead to the gun case."

Throughout the testimony of the later assigned Assistant District Attorney before the hearing court, he made clear, again and again, that there were conversations with Dubin in which he discussed with or learned from Dubin that Dubin was aware of the ballistics connection between defendant's gun and the Melendez homicide, and that Dubin had made this known to his client. Thus, in testifying as to the discussions with Justice Kapelman concerning an immediate hearing on defendant's motion to suppress, he testified "Both Mr. Dubin and I tried to impress upon Judge Kapelman that this was significant case, even though just a gun case, because homicide rested upon this * * * Because the gun was connected to the homicide." He further stated: "I am relating to you what Mr. Dubin said to me. I am not privy to the conversation between Mr. Dubin and Pilotti. I am telling you what Mr. Dubin related to me and Mr. Dubin was aware the gun was linked to the homicide, was the homicide weapon, and that he told me that he told his client this. And that he was running a risk because if we ever get the rest of the circumstantial case together, placing I guess the defendant Pilotti closest to the crime scene, that that would have been enough to establish a circumstantial evidence case which * * * [the bureau chief] didn't feel we had at that tiem [sic]." Similarly, the later assigned Assistant District Attorney responded to the following question:

"Q. He said that he knew, according to your testimony, that this very gun that was the subject of Mr. Justice Ramos' hearing was the murder weapon; he knew that that was the murder weapon based on what he had been told, is that what you are telling us?

"A. Yes. That was the purpose we did the hearing."

The dissent's proper conclusion that Dubin and defendant were never apprised of the ballistics connection necessarily shakes the credibility of this testimony. Thus, all of the speculation in the dissent concerning who said what provides no support for the conclusion that defendant and his lawyer knew of the ballistics tie-in and that the later assigned Assistant District Attorney only inadvertently testified to conversations that could never have taken place.

We are faced, on this motion, with a situation in which defendant rejected an opportunity to plead to the gun charge to cover the unindicted Melendez homicide, subject to a sentence of 2½ to 5 years consecutive to the Figueroa sentence, because he did not know of the ballistics tie-in, not made known to him until two years later. It was on this basis that he took the plea subject to a concurrent sentence. Such a result, plainly not of defendant's making, cannot be permitted to stand.

Nor is it a response to suggest that the real issue is defendant's guilt or innocence. The real issue is the sentence imposed upon him in the Melendez case as a consequence of his plea. It is true, as the dissent contends, that defendant's admission in the gun case was never used against him in the Melendez prosecution. However, as the record makes clear, it was not used because defendant did not take the stand to deny or explain his possession of the gun.

After the motion to preclude the use of his plea in the Melendez case was denied, and the Assistant District Attorney promised not to use his admission unless he did take the stand and deny possession, there was no opportunity for defendant to avoid the consequences of his plea. Thus, the real question before us is not, as the dissent suggests, whether he waived his right to move to vacate the plea because that issue was available to him on his appeal in the Melendez case. The contention that he should have moved to vacate his plea on the appeal from the Melendez conviction simply does not make sense. Such a motion was certainly not available on that appeal.

The suggestion that the attempt to vacate the plea is "transparently a circuitous effort to provide a basis for a new challenge to the Melendez conviction on an issue that was already determined" is not an appropriate concern. If such a challenge is made, the court can then consider the problem in that context. The ground or issue raised upon the motion was not previously determined on the merits upon a prior motion or proceeding in a court of this State (CPL 440.10 [1] [b]; 440.10 [3] [b]).

The speculation in the dissent as to what defendant would have done on the trial of the Melendez case, had he not been misled, is without basis. Completely unrealistic is the notion that defendant and his lawyer would have rejected the alternate plea had they known, as was their right, that there was a ballistics tie-in. The controlling reality is that defendant was misled on an issue which was crucial to the taking of the plea, and misled by the actions of the Assistant District Attorney who, even now, insists to the contrary.

Accordingly, the order of the Supreme Court, Bronx County (Lawrence J. Tonetti, J.), entered October 21, 1985, denying defendant's motion to vacate the judgment of conviction and the 2½- to 5-year sentence as a second felony offender rendered against him on April 3, 1978 upon his plea of guilty to criminal possession of a weapon in the third degree, should be reversed, on the law, and the motion to withdraw the plea and vacate the sentence should be granted.

SANDLER, J. P. (dissenting). On February 28, 1978, the defendant, Dominic Pilotti, entered a plea of guilty to criminal possession of a weapon in the third degree pursuant to a plea bargaining agreement under which he was thereafter sentenced to a term of 2½ to 5 years, that sentence to run concurrently with a sentence of 11 to 22 years imposed on the defendant the year before when he pleaded guilty to manslaughter in the first degree under an indictment charging him with the murder of Wilfredo Figueroa. In the course of a detailed allocution, the defendant acknowledged that the only promise made to him was that the sentence to be imposed was to run concurrently with the sentence fixed under the Figueroa manslaughter plea.

In response to the court's request to describe the facts in his own words, the defendant admitted that "On April 9, 1977 I possessed a .357 Magnum pistol", that the pistol was loaded, and that he possessed it in a taxicab.

Alleging that this plea was induced by fraudulent misrepresentations and omissions by the prosecutors, the defendant moved pursuant to CPL 440.10 (1) (b) to vacate the judgment in July, 1984—more than six years after the plea was entered, after the defendant had completed service of his concurrent sentence, and more than four years after the defendant, and his counsel, became aware of the central fact relied on in this motion, and included that fact in a motion to preclude the use of the defendant's plea in the Melendez murder trial, a motion that was denied by the court in an order that could have been appealed by the defendant following his conviction in the case, but was not in fact an issue raised on that unsuccessful appeal.

In his motion papers, defendant's counsel alleged: "The ground for this motion is that Mr. Pilotti's guilty plea was induced by fraudulent misrepresentations and omissions by the prosecutors which induced him to plead guilty. The misconduct in question took the form of withholding a critical document from the defense, which, had it been disclosed, would categorically have precluded Mr. Pilotti from pleading guilty and allocuting to the offense."

As amplified in the affidavit of defendant's counsel, the gun which Pilotti admitted possessing had been ballistically connected with the killing of Jose Melendez. The affidavit alleged that the District Attorney's office intentionally withheld from the defendant the police report establishing this connection in order to induce Pilotti to plead guilty to possession of the gun so that the plea could be used against him in the Melendez murder trial. The Melendez case was tried during October and November of 1980, following the indictment of defendant and a codefendant, Louis Giongetti, that was filed on December 21, 1979.

The motion papers included an affidavit by Lawrence A. Dubin, the attorney who represented Pilotti at the time of the plea to possession of a gun. Mr. Dubin deposed that he had never received from the District Attorney, in response to his request for all DD-5's and *Brady* material, a report establishing a ballistics connection between the gun and the Melendez homicide; that he was under the impression from material supplied to him by the District Attorney that the weapon was not connected with the commission of any other crime; that it would have been his practice in connection with a gun case where the police action was precipitated by a shooting to have asked the District Attorney if the weapon was connected to

any crime other than the subject of the indictment; and that he was not told that it was so connected. Accordingly, he advised Pilotti to enter a plea of guilty "since no other issue existed" and Pilotti's right to appeal from a denial to suppress the gun was preserved.

After a hearing, the court denied the motion to vacate the plea of guilty to possession of the gun, concluding as a "matter of law" that there was no fraud, and rejecting the defendant's contention that he and his lawyer did not know that his gun had been ballistically matched with the Melendez homicide.

Although the record strongly supports the hearing court's determination that Pilotti's plea was not induced by fraudulent misrepresentations and omissions, the hearing court clearly erred in the finding that the defendant, and his then counsel, knew at the time of the plea that the gun had been ballistically connected with the Melendez homicide. The origin of this error is clear, it having resulted from the hearing court's misinterpretation, an understandable one, of an excerpt of a transcript dated June 7, 1977, in which, in connection with Pilotti's unsuccessful motion to withdraw his manslaughter plea in the Figueroa case, he asserted that prior to the plea the Assistant District Attorney originally assigned stated that he had been caught with a gun in his belt which had been ballistically connected with the Melendez homicide.

A study of the testimony of the homicide detective in the Melendez trial, not called to the attention of the hearing court, makes it clear that the District Attorney's office did not learn of the gun's ballistic connection to the Melendez homicide until almost two months after the statement attributed to the Assistant District Attorney.

Although not central to the issues that divide the court, let me note my emphatic disagreement with the conclusion in the court's opinion that "it is plain" from the record that the Assistant District Attorney originally assigned falsely informed defense counsel, and presumably the Figueroa Trial Judge, who was clearly a party to the conversation, that the Pilotti gun was ballistically connected to the Melendez homicide before that connection was established. The record indicates at least six alternative explanations for Pilotti's statements consistent with the Assistant District Attorney having truthfully informed counsel and the court of the facts surrounding Pilotti's arrest that are individually and collectively far more probable than the inference accepted in the court's opinion.

Pilotti (1) may have misunderstood that which was told him by his defense counsel, the words "connected" and "ballistically connected" having an obvious potential for confusion in this context, (2) may have inadvertently rephrased what his lawyer told him in a way that altered its meaning, and (3) may have deliberately misstated what he had been told, which would have been only one of a number of obviously exaggerated and deceptive statements that the defendant made in the course of his frantic efforts to vacate a plea of guilty to manslaughter which he had entered in the middle of the Figueroa trial only after two eyewitnesses had identified him as the killer. Alternatively, defense counsel (4) may have misunderstood what the District Attorney said to him and the Trial Judge, (5) may have inadvertently rephrased it in a way that altered its meaning, and (6) may have deliberately overstated what he had been told in an effort to persuade the defendant to accept a plea suggested by the trial court that would cover both homicides, and that would have saved the defendant from the significant prospect of a conviction for murder and a 25-year-to-life sentence.

If Mr. Dubin had been told by the defendant, his partner who was present at the hearing, or by his predecessor attorney that the Assistant District Attorney had made the statement asserted by the defendant, and if he believed that such a statement had been made, it is extremely hard to understand why he never testified to having discussed that significant statement with the defendant, and even harder to understand why he did not undertake to ascertain from the Assistant District Attorney originally assigned the truth of a statement contrary to his understanding of the situation on a matter alleged to have been of prime importance. In addition, it is manifestly unfair to the Assistant District Attorney originally assigned and his bureau chief to fault them for failing to respond to the defendant's statement when the record clearly discloses that the court shut off any further discussion of the Melendez matter by saying that it was not before him, "and I don't care what happened in that case", and immediately proceeded to present a detailed chronology of the events leading up to the plea of guilty that concluded with his sentencing the defendant to the previously agreed sentence.

Because of the hearing court's erroneous conclusion that Pilotti and his counsel were aware that the gun found in his possession had been ballistically connected to the Melendez

homicide, it becomes necessary for this court to undertake a de novo examination of the record, and to make new findings.

The issues with which we are concerned on this appeal arise out of events that occurred in the early morning of April 9, 1977. On that morning, Pilotti, on bail and awaiting trial scheduled to commence in two days on an indictment charging him with the murder of Wilfredo Figueroa, was arrested for criminal possession of a gun and for homicide in connection with the fatal shooting of Jose Melendez. Because the strength of the evidence with regard to Pilotti's possession of a gun on that morning is relevant to the motive to deceive attributed to the District Attorney's office, it is appropriate to set forth in some detail the circumstances surrounding Pilotti's arrest.

At about 9:30 in the morning, several witnesses heard shots fired from a green Pontiac station wagon bearing New York license plates 232 XDP, shots which caused the death of Jose Melendez, the occupant of another car. A license plate check quickly established that the Pontiac was registered to a woman living at 2517 Radcliffe Avenue. Police officers responded quickly to that address, reaching it within a few minutes. They there saw the green Pontiac station wagon bearing the license plate number reported by the witnesses. The building at that address was a three-story apartment house dwelling. The house was kept under observation for a period of 45 minutes.

The officers then saw a man stick his head out of the door to 2517 Radcliffe Avenue, looking in both directions before exiting. The man was quickly joined by two others, one of them the defendant. The defendant, dressed in formal clothing and wearing a white fur coat, walked past the Pontiac station wagon and into a cab, apparently one that had responded to a telephone call. His two companions walked in another direction. One officer approached the two men, later identified as Louis Giongetti, ultimately a codefendant in the Melendez murder case, and Alfred Peruso. A frisk of Giongetti disclosed a loaded .32 caliber revolver and a blackjack.

The second officer walked to the cab, went to the rear passenger door, which he opened, observed the defendant with his white fur coat on the seat next to him, and asked him to leave the vehicle. The defendant asked if he could get his coat, and was told not to touch anything and to step out, which he did. The officer escorted him to the front of the cab where they were met by members of a back-up unit. The officer then

returned to the cab for the purpose of picking up defendant's coat, and as he did so, felt a hard object under the coat, and found under it a loaded .357 Magnum revolver wrapped in a dishcloth, a gun with two empty chambers, and which ballistics evidence later determined had been recently discharged and was the weapon that had killed Melendez. All three men were arrested and charged with Melendez' death, although Peruso's arrest was "rescinded", presumably after he informed the police that the defendant and Giongetti had been with him in the Pontiac station wagon, and that he had observed them with guns at a time that shots were fired.

At the Melendez trial the cab driver testified that, in accordance with his invariable practice, he had looked at the back seat after discharging his most recent passenger before the defendant and had observed no gun.

On April 11, 1977, defendant's trial for the murder of Figueroa commenced with pretrial hearings. On April 15, after two witnesses had identified the defendant as Figueroa's killer, he pleaded guilty to manslaughter in the first degree under a plea bargaining agreement which provided for a sentence of 11 to 22 years in prison.

On May 8, 1977, the defendant was indicted for the crime of criminal possession of a gun in connection with the events of April 9, 1977. From the evidence adduced in the subsequent Melendez murder trial, it is clear that, when the case was presented to the Grand Jury, the District Attorney did not know that the gun, for the possession of which Pilotti had been indicted, was ballistically connected with the Melendez homicide. It is also clear that Peruso had departed in his Grand Jury testimony from his postarrest statement, was indicted for perjury and absconded at a time not fixed in the record, and that he was missing at the time Pilotti entered his plea of guilty.

As already indicated, Pilotti entered his plea of guilty to the gun charge on February 28, 1978, some nine months after his indictment on that charge. Pilotti and Giongetti were indicted for the murder of Melendez on December 21, 1979, almost two years after Pilotti had entered his guilty plea. The record is clear that the Melendez murder case was presented to the Grand Jury only after the apprehension of Peruso and Giongetti, who had also absconded. Contrary to an impression suggested by parts of the record, the case was presented and the indictment voted before this court, on December 20, 1979,

affirmed the denial of Pilotti's motion to suppress the gun, and some months before the Court of Appeals denied his application for leave to appeal from that affirmance. *(See, People v Dominick Pilotto,* 73 AD2d 846, *lv denied* 49 NY2d 895, *cert denied sub nom. Pilotti v New York,* 449 US 870.)

Before detailing the relevant parts of the hearing evidence, some of which has a Rashomon-like quality, it may be helpful to set forth preliminarily the factual conclusions supported by the record, and also to discuss in a unified way, at the risk of some later repetition, two critical aspects of the record—the defense theory of deliberate misrepresentations by the District Attorney's office, and contradictory testimony on a critical issue by the two principal witnesses, Mr. Dubin, the defense lawyer, and the Assistant District Attorney later assigned.

From a study of the hearing record, it is clear that the defendant, and his counsel, did not in fact know at the time the plea was entered, that the gun had been ballistically matched to the Melendez homicide. It is also clear that this misunderstanding was contributed to significantly by defense counsel's receipt during the discovery process of two DD-5s (police reports), dated April 14 and 15, 1977, which reported no ballistics connection between Pilotti's gun and shells found in a codefendant's pocket, and no connection between that gun and ballistics evidence found at the scene of the homicide, and the failure of the District Attorney to turn over to defense counsel a DD-5 dated June 2, 1977, reporting that Pilotti's gun was ballistically matched to a bullet found in the body of the deceased.

The record does not, however, support in any respect the defense contention that the failure to turn over the June 2 report was purposeful or part of a deliberate effort by the then Assistant District Attorney to deceive defense counsel. On the contrary, every relevant circumstance in the record, realistically considered, points inexorably to the conclusion that the failure to turn over the June report was not purposeful, but resulted from an inadvertent omission either by the Assistant District Attorney first assigned to the case, or by someone to whom the responsibility for assembling and turning over discovery material had been delegated.

The most likely explanation for the omission lies in the circumstance that the assigned homicide detective in the Melendez case first learned of the ballistics connection and prepared his report on June 2, 1977, some six weeks after the

earlier reports, and almost a month after the indictment. Although not a matter of record, it is sufficiently a matter of public record to take judicial notice of the fact that for many years and during the time with which we are concerned, it was the policy of the Bronx District Attorney's office to make a voluntary disclosure of those matters that the court would direct to be disclosed, and that such disclosure usually occurred on the day that the defendant was arraigned on an indictment, or shortly thereafter.

If the defense in fact received the April 14 and April 15 DD-5s, as the defendant alleges and I believe, that transfer most probably took place weeks before the District Attorney's office learned of the ballistics connection. It would hardly be a remarkable departure from what we know of the human capacity for error for the Assistant District Attorney originally assigned, on learning of the belatedly established ballistics connection, to have focused on its implications for the prosecution of the Melendez homicide, and not to have appreciated that the information would be embodied by the homicide detective in a report clearly related to those previously turned over, and that he should forward that report to the defense counsel. What would be a remarkable departure from normal behavior would be for the Assistant District Attorney to seize on this belatedly received information as an opportunity to deceive the defense into agreeing to a plea that was in fact entered some nine months later, to secure the acquiescence of his bureau chief in that deception or to have concealed it from his bureau chief, and to have thereafter recruited the Assistant District Attorney assigned to the case on the eve of the suppression hearing into becoming a participant in the deception.

That what occurred here was inadvertent human error of a kind that occurs all too often in every area of human experience and did not involve purposeful deception is supported by a host of circumstances to be discussed hereafter, and is convincingly confirmed by direct, highly probative testimony, the probative value of which is enhanced by the likelihood that the witness did not appreciate its significance.

The Assistant District Attorney assigned to the case by his bureau chief only a few days before the plea was entered because the Administrative Judge had insisted that the case proceed promptly and the Assistant District Attorney originally assigned was then unavailable, testified that he was told by the Assistant District Attorney originally assigned that all

of the police reports had been turned over to defense counsel. Accepting this testimony as reliable, and there are compelling reasons to do so, it directly establishes that the originally assigned Assistant District Attorney not only did not intentionally withhold the June report, but that he had been acting for some time in the belief that defense counsel had received all of the relevant police reports. It is surely not a plausible hypothesis that he deliberately withheld the June police report to deceive defense counsel, and then undertook to deceive the assistant thereafter assigned to the case.

Turning directly to the defendant's main thesis of purposeful deception, the fact must be squarely faced that defendant is accusing at least two Bronx Assistant District Attorneys, and almost certainly a third, the chief of the Homicide Bureau, of professional misconduct of a grave character. It would not be a minor professional lapse for Assistant District Attorneys to undertake a concerted effort persisting over many months to deceive a defendant into pleading guilty to possession of a gun in order to use that judicial admission in the prosecution of a homicide indictment filed thereafter.

There are two quite remarkable aspects to defendant's claim. The first is the highly risky character of the misconduct attributed to at least two, and more likely three Assistant District Attorneys, in relationship to the benefits that they could have anticipated. The second is that the motivation attributed to the Assistant District Attorneys for this misconduct is irreconcilable with the alternative plea bargain in fact offered to the defendant, one alternative providing for a plea to cover the Melendez homicide with a 2½- to 5-year consecutive sentence, it manifestly being in the interest of the District Attorney with respect to the alternative plea clearly preferred by them that the defendant know that the gun found in his possession was ballistically matched to the homicide.

A striking aspect of the misconduct alleged is that those charged with participation could not reasonably have expected to reap its fruits without the nature of their deception becoming known, and becoming a subject of challenge in court. Inherent in the misconduct charged is the certainty that the defendant and his then counsel (quite possibly the lawyer who represented him on the gun case), would learn of the deception leading to the gun plea before it could be used as presumably intended in the prosecution of the Melendez murder, and at a time when the defendant and his counsel would have the strongest motivation to expose the deception that

had been practiced on them, in an effort to preclude the use in any way of the gun plea in the Melendez murder trial. Nor could the Assistant District Attorneys have any assurance that defense counsel, accurately described by the Hearing Judge as an experienced and respected lawyer, would not have made contemporaneous memoranda detailing the representations that had been made to him. Indeed, the Assistant District Attorneys could have had no assurance at any time during the months that intervened between the discovery process and the entering of the plea, that their plans would not be effectively forestalled, and their misconduct discovered even before the plea was entered, by defense counsel noting on the record at the time of the plea, his understanding, and the basis for his understanding, that the gun was not connected with the Melendez homicide.

And to what end did the Assistant District Attorneys undertake this highly risky course of professional misconduct? The motivation attributed to them was the desire to use the defendant's gun plea during the Melendez murder trial to confirm the fact that Pilotti was in possession of the murder weapon. But as the facts surrounding Pilotti's arrest make clear, the evidence of his possession of the gun was overwhelming, and could not possibly have given rise to any flicker of anxiety as to that element of the homicide case on the part of the most fearful and pessimistic trial assistant. So strong was the evidence of Pilotti's possession of the gun, that Mr. Dubin, testifying at the hearing as to the strategy that he would have pursued if the gun case had gone to trial, stated that he would have interposed the defense of "transitory possession", surely a defense of desperation under the circumstances, but one that confirms the reality that no competent lawyer concerned with the matter could have doubted that a jury would have been convinced from the evidence that Pilotti had in fact possessed the gun.

The implausibility of the defendant's thesis is further underlined by the fact, incontrovertibly established, that the District Attorney's office's decision not to indict Pilotti for the Melendez murder at that time was wholly unrelated to any fears concerning the adequacy of the proof of his possession of the murder weapon. What the contemporaneous memorandum of the later assigned Assistant District Attorney to his bureau chief establishes is that the Homicide Bureau chief, at the time of the plea to possession, was of the opinion that additional evidence connecting Pilotti to the Melendez murder,

wholly apart from evidence establishing Pilotti's possession of the murder gun, was required before he could successfully be prosecuted, and that there was no assurance that such evidence would be forthcoming. The primary hope at the time for securing such additional evidence related to locating Alfred Peruso and inducing him to testify in accordance with his statement to the police. It was for this reason that Pilotti and his codefendant were not indicted in the Melendez homicide until December 21, 1979, after the apprehension of Peruso and the codefendant.

It is of no moment to the issue presented that Peruso ultimately proved to be an uncooperative witness. What is quite clear is that at the time Pilotti's gun plea was entered, the District Attorney's office did not intend to proceed with his prosecution for the Melendez murder unless additional evidence was obtained—evidence which they had no assurance of securing.

In short, the defense thesis of fraudulent misrepresentation requires it to be accepted as probable that two or more Assistant District Attorneys undertook a highly risky course of professional misconduct that was certain to be exposed prior to reaping its intended fruits, and likely to become the subject of a motion, in order to secure additional evidence on an issue as to which the evidence in the District Attorney's possession was conclusive, for use in a homicide prosecution that the bureau chief did not then intend to pursue unless evidence connecting Pilotti with the homicide, other than his possession of the murder gun, was obtained.

What makes the defense thesis even more implausible is the reality that from the standpoint of the alternative plea bargain proposed by the District Attorney's office to defendant, it was important to the District Attorney that the defendant and his counsel know that Pilotti's gun was ballistically connected to the Melendez homicide. The proposed plea bargain was in the alternative—2½ to 5 years to run consecutively to the Figueroa sentence if the plea covered the Melendez homicide, and 2½ to 5 years to run concurrently with that sentence if it did not.

From an examination of the contemporaneous memorandum of the later assigned Assistant District Attorney to his bureau chief, and on any realistic view of the record, it is clear that the Homicide Bureau chief preferred that the defendant accept the proposed plea covering the Melendez

homicide case, in the absence of the additional evidence which he then had no assurance would be acquired. From the standpoint of this preferred alternative, it was important that defense counsel know that the Pilotti gun had been ballistically connected with the homicide, and that there was a real possibility that he might ultimately be successfully prosecuted for that homicide. It makes no sense at all to believe that the Assistant District Attorneys engaged in purposeful misconduct to withhold from defense counsel information that they would have wanted him to have in order to accomplish the plea bargain that was clearly preferred by their bureau chief.

Turning to the testimony of the principal witnesses, Mr. Dubin, defense counsel, and the Assistant District Attorney later assigned, we are confronted with a direct, and perplexing contradiction between them on an issue of central importance. The Assistant District Attorney testified that at one point during plea discussions Mr. Dubin made it clear that he knew that Pilotti's gun had been ballistically connected to the Melendez homicide. In turn, Mr. Dubin testified that the Assistant District Attorney explicitly told him that there was no report establishing a ballistic connection between the gun and the homicide. Although a study of the record is persuasive that both witnesses testified throughout truthfully in accordance with their best recollection, it seems equally clear that the testimony of both on this point was inaccurate.

On any realistic consideration of the evidence, it is clear that Mr. Dubin and his client did not know of the ballistics connection. In addition to other factors not necessary to detail, it is not plausible that Mr. Dubin, if he had known of the ballistics connection, would have permitted his client to enter a plea to the gun charge that did not cover the Melendez homicide without having secured on the record the defendant's acknowledgement that he had been so informed. It is almost equally implausible that the defendant, if he had known of the ballistics connection, would not have opted for the alternative plea covering the unindicted Melendez homicide for a consecutive sentence of only 2½ to 5 years.

On the other hand, for reasons already set forth at length, it is equally inconceivable that the Assistant District Attorney just assigned to the gun case and the bearer of a plea offer from his bureau chief covering an unindicted homicide—an offer whose acceptance was clearly preferred by his bureau chief to the plea that was in fact entered—would have deliber-

ately withheld from defense counsel the information that would have facilitated acceptance of the preferred plea.

What a close study of the relevant testimony strongly indicates is that the inaccurate testimony on this point by both witnesses was not the result of one or the other, or both, intentionally giving false testimony, but rather resulted from a not uncommon trial phenomenon in which witnesses testifying to long-past events remember in good faith as having actually been said that which they believe to have been intended, interpretations which in this case were distorted by a fundamental misunderstanding between the two that is central to an understanding of this case. Having been told by the Assistant District Attorney originally assigned that all of the police reports had been turned over to defense counsel, the Assistant District Attorney later assigned clearly assumed throughout his conversations with Mr. Dubin that Dubin knew of the ballistic connection, although he in fact did not. When the testimony of both witnesses is analyzed in the light of this fundamental misunderstanding, it becomes clear how each misunderstood the meaning of what the other said and came to recall many years later the other as having said something that was not in fact said.

Before specifically analyzing the directly contradictory parts of their testimony, consideration of another aspect of the testimony is important to an understanding of what occurred.

In evaluating the testimony of the two, it is critical to bear in mind that both were testifying with regard to events of a routine character in their professional lives that had occurred some seven years earlier, Mr. Dubin testifying without the benefit of any contemporaneous notes to refresh his recollection. Lapses in memory under such circumstances were inevitable, and the record discloses such lapses on the part of both.

The most significant lapse clearly demonstrated by the record, and one of considerable importance, was Mr. Dubin's inaccurate recollection that his client's plea included a consecutive 2½- to 5-year sentence, and his accompanying total failure to recall the alternative plea bargain that had been offered by the District Attorney, his own recommendation to his client to accept the option to cover the Melendez homicide with a consecutive sentence, and his client's rejection of that advice. Because of the importance of the events which he forgot, and their intimate relationship to events involved in the testimony with which we are concerned, the possibility is

clearly presented that his memory was flawed as well in the testimony by him described above. This possibility is clearly supported by the fact that in his affidavit prepared the year before, Mr. Dubin disclosed no recollection of the conversation with the Assistant District Attorney later assigned to which he testified at the hearing, and is further supported by the detailed testimony of his client who conspicuously did not testify that his lawyer had reported an explicit statement by the District Attorney that negated any ballistics link between the gun and the homicide. Although these circumstances would justify rejection of this part of Mr. Dubin's testimony as insufficiently reliable, there is some reason to believe that his testimony may well have reflected in part an accurate recollection of the conversation, followed by Mr. Dubin's attributing to the Assistant District Attorney later assigned explicit statements that were not in fact made, that reflected Mr. Dubin's mistaken interpretation of the meaning of what was said.

Turning to the conflict in testimony described above, it is a matter of common experience, as already noted, that the most conscientious witnesses testifying to events that occurred many years before find it difficult, if not impossible, to separate their memory of what was actually said from their recollection of the meaning of what was said. A study of the testimony of both men strongly suggests how the fundamental misunderstanding described above contributed to a misinterpretation by each witness of the meaning of the other's statements.

Addressing first the testimony of the Assistant District Attorney later assigned, his most detailed and specific account of his conversation with Mr. Dubin occurred in response to the court's question as to whether he told Mr. Dubin, and Mr. Dubin was aware, that the gun was involved in the homicide. The witness answered as follows: "Once he told me that. Mr. Dubin told me that, outside Part 19, because he was concerned that Mr. Pilotti would not be covered in the unindicted case and he was concerned with that and he kept urging him to do it, strike the best plea bargain because that was the thing to do and Mr. Pilotti would not go along for whatever reason, and so Mr. Dubin told me this your honor. I didn't have to tell him. He told me this, that he was aware of it and he knew that if we ever came up with this witness—I don't know if he knew who the witness was or not—that we could ultimately indict him, which apparently did happen."

What becomes clear from this detailed answer is that from the standpoint of the Assistant District Attorney later assigned, who had been told that Mr. Dubin had all the police reports, Mr. Dubin's dismay at his client's failure to accept the plea covering the homicide necessarily conveyed his knowledge that the gun had been ballistically connected. From the perspective of Mr. Dubin, who did not in fact know of the ballistics connection, it is clear, and indeed reflected in the quoted testimony of the Assistant District Attorney later assigned, that he was fearful that the District Attorney might eventually locate Peruso and induce him to testify, and that his client was foolish not to preclude that possibility. Indeed, it would seem likely that Mr. Dubin viewed the 2½- to 5-year consecutive sentence offer—an extremely light sentence for what appears to have been a planned killing—as confirming that the gun had not been ballistically connected.

A quite similar process may be observed in that part of Mr. Dubin's testimony in which he gave his most detailed account of the circumstances under which he was told by the Assistant District Attorney later assigned that there was no ballistics connection. Asked by defense counsel what he and the District Attorney said to each other about the match or nonmatch, he testified as follows: "In sum and substance, I mean this is going back some eight years, I asked whether there was a connection between the weapon that was recovered from the taxi cab that Pilotti had been arrested in and the Melendez gun, and I was told, in substance, that there was no connection. There was no ballistic report in existence or there was no other and there was, in fact, no other evidence tying that gun to the homicide, the murder weapon in the homicide case."

What is obvious from Mr. Dubin's testimony is that the question he asked, as he recalled it, in his most specific statement on the issue, did not in fact have the meaning that he retrospectively attributed to it. He did not ask the District Attorney whether the Pilotti gun was matched with the Melendez homicide. As recalled by him, he asked whether there was a connection between the Pilotti gun and the Melendez gun. But Melendez in fact had a gun. To an Assistant District Attorney who believed that Mr. Dubin was aware of the ballistics match, the question would naturally have conveyed an inquiry as to whether there was information connecting in other criminal activities two guns that were involved in the Melendez case, and the answer testified to would have been accurate. Yet, it was clearly on the basis of

the answer to this question as remembered by Dubin, that he apparently concluded that the Assistant District Attorney later assigned had denied the existence of any report establishing a ballistics match.

Indeed, from an examination of his entire testimony it seems clear that Mr. Dubin never directly put to the Assistant District Attorney later assigned a question that would have alerted him to the fact that Dubin did not know of the ballistics match, and that the curiously oblique question as remembered by him in fact fairly characterized his discussions with the Assistant District Attorney. The reason for this omission, it may be reasonably surmised, lies in the obvious fact that a direct question as to whether or not the gun had been ballistically matched to the Melendez homicide would have constituted an acknowledgement that his client knew that the gun had been fired during the Melendez homicide, since there would otherwise have been no plausible reason for any concern on that point.

Although the foregoing discussion embraces much of the critical testimony at the hearing, it will nevertheless be helpful to a full understanding of the issues presented to develop in further detail the testimony of the principal witnesses at the hearing, Mr. Dubin and the defendant on the one side, and the Assistant District Attorney later assigned on the other.

Although understandably uncertain in his memory of much that occurred, Mr. Dubin recalled that he had many discussions with the defendant about the weapon and the weapon's possible relation to the homicide. He recalled that in the normal course of his representation motions had been made for discovery material, including DD-5s and ballistics reports, but was not clear as to whether or not such discovery material was secured as a result of court order or through a voluntary agreement with the District Attorney's office. In testimony that both reflects the understandable uncertainty of his memory and his scrupulous efforts to be truthful, Mr. Dubin testified that he believed, but was not certain, that he had seen the April ballistics reports, conscientiously accompanying each of his answers to questions with regard to those reports with the qualification that he was not certain that he had seen them. He was, of course, emphatic that he had never seen the report of June 2, 1977.

From his testimony it is apparent that just before the plea

was entered and at a time that it was being considered, the defendant expressed an urgent concern about the weapon and its connection with the Melendez homicide, and directed him to determine whether there was a connection of any sort whatever. It is also clear from Mr. Dubin's testimony as well as that of the defendant himself, although he of course did not so testify, that the defendant's concern about the ballistics connection was based on the defendant's precise knowledge that the gun had in fact been discharged during the Melendez homicide, there being no plausible reason as to why there should otherwise have been such concern. It was on the basis of defendant's concern while they were considering the plea offer that Mr. Dubin recalled having the conversation with the Assistant District Attorney later assigned that was quoted and considered previously.

On the question of whether or not that Assistant District Attorney explicitly told Mr. Dubin that there was no ballistics connection, Pilotti's testimony is particularly helpful. The defendant had a very detailed recollection of having seen the April 1977 reports and of having discussed them at length and repeatedly with his lawyers, and recalled quite clearly his lawyers' assurances to him on the basis of those reports that there was no ballistics evidence connecting the gun found in his possession with the homicide. In what may fairly be considered a significant omission, considering the specific and detailed quality of his recollections, he never testified to being told by defense counsel that the Assistant District Attorney had explicitly denied the existence of any ballistics match, even though it seems likely that he would have remembered such a statement.

The Assistant District Attorney, whose testimony was clearly refreshed in part by a memorandum that he had submitted to his bureau chief shortly after the plea, testified to the circumstances under which he was assigned to the gun case, at least for the purposes of the suppression hearing, shortly before the plea was entered. He testified that he was aware that the gun was connected with the Melendez homicide, and that in a discussion with the Assistant District Attorney originally assigned he was told that the defense had received everything in the file by way of police reports.

He recalled that in plea discussions Mr. Dubin indicated that Pilotti had not previously wanted the unindicted Melendez homicide to be covered, but that Mr. Dubin believed this to be a dangerous course of action and invited from him a plea

offer that would cover the unindicted homicide. In a discussion with his bureau chief, the Assistant District Attorney later assigned was authorized to offer a plea to the gun to cover the Melendez homicide, with the defendant to receive a 2½- to 5-year sentence to run consecutively to the sentence that had been imposed on the Figueroa manslaughter plea. The reason given by the bureau chief for this offer was that there was a missing witness in the Melendez case who might never be found, and that under the circumstances the disposition seemed to him appropriate.

As recalled by the Assistant District Attorney later assigned, Mr. Dubin favored the plea, but he thereafter informed him that his client, against his strong recommendations, had decided not to cover the case and was confident that they would never be able to prosecute him successfully for the Melendez homicide. Mr. Dubin said his client was willing to take a plea to criminal possession of a gun with a concurrent 2½- to 5-year sentence. Thereafter, a suppression hearing was held resulting in a denial of the motion to suppress, and the plea was entered.

The facts testified to by the Assistant District Attorney later assigned are essentially in accord with the memorandum prepared by him to his bureau chief shortly after the plea was entered. The memorandum reported Mr. Dubin's own preference that his client accept the plea that would cover the unindicted homicide, but that Mr. Dubin's client had refused to do so. The memorandum clearly sets forth the judgment of the bureau chief that the defendant could not successfully be prosecuted for the Melendez homicide notwithstanding his possession of the murder gun, in the absence of other evidence connecting him with the homicide.

The memorandum further describes the later assigned Assistant District Attorney's concern that even if such additional evidence were to be secured and the suppression ruling were to be sustained, a double jeopardy issue might well be raised at any trial of the defendant for the Melendez homicide because of the separate disposition of a gun that had been ballistically connected to the homicide. Parenthetically, it is of some interest that such an issue was in fact forcefully raised in motion papers submitted on behalf of the defendant during the Melendez prosecution.

It was in relation to the later assigned Assistant District Attorney's concern about this possible double jeopardy issue

arising out of a separate disposition of a gun ballistically connected to the Melendez homicide that he added a statement, the meaning of which has been severely distorted by the defendant on this appeal. He wrote: "Good faith and the argument that we attempted to prove the homicide b[y] bootstrapping the gun charge may very well be a case of first impression in this State." It makes no sense at all to interpret this sentence as an indirect reference to a course of deception having been practiced by the writer of the memorandum, presumably with the knowledge and approval of the bureau chief.

When the evidence is reviewed as a whole, and realistically, the conclusions previously set forth are solidly sustained. The defendant and his lawyer did not in fact know that the gun had been ballistically linked to the Melendez homicide, and this misunderstanding was in large part contributed to by an inadvertent error in providing the defense with discovery material that omitted the June report establishing the ballistics link. For the reasons set forth earlier, the evidence is equally persuasive that this omission was inadvertent, and not part of a purposeful effort to deceive the defendant into entering a plea of guilty to possession of the gun.

A question naturally raised by the foregoing factual conclusions is whether the defendant is entitled under CPL 440.10 (1) (b) to vacatur of the judgment of conviction entered on his plea of guilty on the ground that omissions by the District Attorney, although not intended to mislead defendant or his counsel, in fact misled them with regard to a circumstance material to the plea that was entered. Although this theory was not advanced by the defendant in his motion papers, at the hearing, or on this appeal, perhaps because of counsel's belief in its lack of merit, it requires discussion. Under the circumstances presented, it is clear that defendant is not entitled to the relief he seeks.

CPL 440.10 provides in pertinent part:

"1. At any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that * * *

"(b) The judgment was procured by duress, misrepresentation or fraud on the part of the court or a prosecutor or a person acting for or in behalf of a court or a prosecutor".

Central to an understanding of this section are the words that permit the motion to be made "at any time after the

entry of a judgment". Considered in light of that critical aspect of the section, it is hard to believe that the word "misrepresentation" in subdivision (1) (b) was intended to authorize vacatur of a judgment of conviction based on a plea of guilty, without any limitation of time, on the basis of inadvertent acts or omissions by a District Attorney that, although not intended to do so, misled the defendant as to a possible consequence of his plea of guilty, where the nature of the defendant's understanding, and his reliance on it, is not set forth on the record. *(Cf., People v Ramos,* 63 NY2d 640; *People v Frederick,* 45 NY2d 520, 525; *People v Selikoff,* 35 NY2d 227.)* The correctness of this construction is strongly confirmed by subdivision (1) (c) which immediately follows the subdivision with which we are concerned.

Subdivision (1) (c) permits a judgment of conviction to be vacated where: "Material evidence adduced at a trial resulting in the judgment was false and was, prior to the entry of the judgment, known by the prosecutor or by the court to be false". Significantly, this subdivision permits vacatur of the judgment of conviction only where material evidence was known by the court or the prosecutor to be false, not where the *prosecutor or the court* should have known that it was false, or would have known that it was false in the exercise of reasonable care.

It is difficult to envisage any proposition more likely to undermine finality of judgments of conviction based upon a plea of guilty, the importance of which was reaffirmed by the Court of Appeals in *People v Ramos (supra),* than one that would permit, without time limitations, such judgment of conviction to be challenged on the basis of claims that a prosecutor had inadvertently misled defense counsel on some circumstance relevant to the plea, but one that was not made part of the record at the time of the plea.

Nor is the situation before us one in which a sense of justice would invite the court to strain the meaning of the statutory language in order to achieve a just result. No doubt there may be situations in which the interests of justice would strongly support vacatur of a plea influenced by unintentional conduct by a District Attorney that misled a defendant on a matter material to the plea. This is emphatically not such a case. The interests of justice here point strongly in favor of denying the motion to vacate.

In considering the plea that was here entered, it is clear

that there exists no suggestion whatever, nor could there under the facts set forth above, that the defendant was not in fact guilty of the crime to which he pleaded guilty. Nor is there any suggestion that the concurrent sentence imposed was oppressive or the result of a broken promise.

The single contention is that the defendant, and his counsel, were unaware that the entered plea might be used against the defendant in a homicide prosecution thereafter brought against the defendant. But the record discloses that defendant and his counsel became aware, following his indictment for the Melendez homicide, that in a police report of June 2, 1977, the gun which he admitted possessing had been ballistically connected with the Melendez homicide, and that the District Attorney had failed to turn over that report to him although earlier police reports appearing to negative the gun's connection with the homicide had been made available. Accordingly, the defendant was in a position prior to his trial in the Melendez case to move to preclude the use of his plea of guilty against him in that trial, and thereby to avoid the consequences of whose possibility he was unaware at the time of his plea.

As the record makes clear, the defendant in fact moved in March 1980 to preclude the use of his prior plea against him in a motion which relied on the withholding of the June report, together with other grounds. The order denying that motion could have been raised as an issue by defendant on his appeal from his conviction of murder in the Melendez case, but it was not. The fact that defendant did not couple his motion to preclude the use of his plea in the Melendez case with a specific request that the plea be vacated surely does not entitle him now, more than four years later, to relitigate an issue which he had opportunity to litigate at the time when it was critical that he do so, and which he in fact did litigate, in what is transparently a circuitous effort to provide a basis for a new challenge to the Melendez conviction on an issue that was already determined. Indeed, even if the omissions of the District Attorney were considered sufficient to authorize a court to vacate under CPL 440.10 (1) (b), this would seem emphatically a case in which the court should exercise its discretionary power under CPL 440.10 (3) (b) to deny the motion because "[t]he ground or issue raised upon the motion was previously determined on the merits upon a prior motion or proceeding in a court of this state."

Moreover, on any realistic view of the facts, it is free from

doubt that the defendant was in no way prejudiced in the trial of the Melendez case by the plea that had been entered. Notwithstanding the court's denial of his motion to preclude the plea, the trial assistant in the Melendez case did not use the plea in his direct case, and stipulated that if the defendant testified he would not use the plea unless the defendant specifically denied the facts that he admitted at the time of his plea. Under the stipulation, defendant could have taken the stand and testified in support of his theory of transitory possession of the gun, the theory Mr. Dubin would have pursued if the gun case had gone to trial, without any fear that he would have been confronted with the fact of his plea. More plausibly, he could have testified that he had received the gun from someone else after the homicide for whatever purpose.

It is highly unrealistic to suppose that there was the remotest possibility that, except for the threatened use of the gun possession plea, the defendant, convicted of at least two felonies other then the gun possession case, one of them the Figueroa homicide, would have taken the stand and testified either that the police planted the murder weapon on him, or that the Melendez murder weapon mysteriously appeared on the back seat of a cab that had responded to his telephone call.

The controlling realities are that the defendant was in fact guilty of the crime to which he pleaded guilty, a fact established not only by the evidence adduced at the suppression hearing, but confirmed by his own testimony and that of his lawyer as to his concern about any ballistics connection of the weapon to the Melendez homicide; that the concurrent sentence that he received was more than generous; that the critical facts underlying the motion were known to the defendant and his counsel prior to the trial of the Melendez case; that the issues raised on this motion could have been raised at that time and before any possible use of his guilty plea against him at that time, and were in fact included in part in a motion to preclude any such use; and that the plea he entered did not contribute by a featherweight to defendant's conviction of murder in the Melendez case.

Accordingly, the order of the Supreme Court, Bronx County (Lawrence J. Tonetti, J.), entered October 21, 1985, denying defendant's motion to vacate the judgment of conviction and the 2½- to 5-year sentence as a second violent felony offender rendered against him on his plea of guilty to criminal posses-

sion of a weapon in the third degree on February 28, 1978, should be affirmed.

KASSAL and ELLERIN, JJ., concur with FEIN, J.; SANDLER, J. P., and CARRO, J., dissent in an opinion by SANDLER, J. P.

Order, Supreme Court, Bronx County, entered on or about October 21, 1985, reversed, on the law, and the motion to withdraw the plea and vacate the sentence is granted.