Dominick PILOTTI, Petitioner,

v.

SUPERINTENDENT, GREAT MEADOW CORRECTIONAL FACILITY, Respondent.

No. 90 Civ. 3768 (CHT).

United States District Court,
S.D. New York.

March 18, 1991.

Jay Goldberg, P.C., New York City (Elizabeth Hill, of counsel), for petitioner.

Robert T. Johnson, Dist. Atty., Bronx County, Bronx, N.Y. (Billie Manning and Karen Swiger, of counsel), for respondent.

## OPINION

TENNEY, District Judge.

Dominick Pilotti petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1988). Pilotti was convicted of murder in the second degree, N.Y. Penal Law § 125.25 (McKinney 1987), after a jury trial in the Supreme Court of New York, Bronx County (Schackman, J.). He was sentenced to a term of imprisonment of twenty years to life. The Appellate Division affirmed the conviction without opinion, *People v. Pilotti*, 93 A.D.2d 1005, 461 N.Y.S.2d 663 (1st Dep't 1983), and the New York State Court of Appeals denied Pilotti's application for leave to appeal. *People v. Pilotti*, 60 N.Y.2d 593, 467 N.Y.S.2d 1039, 454 N.E.2d 134 (1983). Pilotti later moved, unsuccessfully, in the trial court to vacate the judgment of conviction pursuant to N.Y. C.P.L. § 440.10 (McKinney 1983). The denial of his motion was upheld on appeal. *People v. Pilotti*, 148 A.D.2d 323, 538 N.Y.S.2d 889 (1st Dep't 1989), *leave to appeal denied*, 74 N.Y.2d 850, 546 N.Y.S.2d 1015, 546 N.E.2d 198 (1989).

Pilotti argues that 1) his right to testify on his own behalf was "chilled" by the prosecutor's threat to impeach him with a fraudulently obtained guilty plea in a prior case; 2) his right to due process was violated in that there was insufficient evidence to support his conviction; 3) his right to due process was violated by the prosecutor's use of pre-indictment delay as an "intentional device to gain [a] tactical advantage;" and 4) his right to be free from double jeopardy was violated by his being tried for murder. For the reasons set forth below, the petition is granted.

## BACKGROUND

On April 9, 1977, at approximately 9:00 or 9:30 A.M., Jose Melendez was murdered while he was sitting in his car at a traffic light. He was shot in the head by the occupants of a Pontiac station wagon which had stopped alongside his car. T. 66, 99, 128.[1] James Correa—a witness who was stopped directly behind the Pontiac at the light—observed three or four people in the Pontiac and saw two hands with guns protruding from the vehicle's window.[2] T. 67. When the light turned green, Melendez's car crashed into a truck and the Pontiac sped away. T. 67–68, 80, 83. Correa was able to observe and write down the Pontiac's license plate number. T. 69–70, 73–74, 76, 81, 83–84.

Upon arriving at the scene, the police obtained the license plate number and traced its owner to an address on Radcliffe Avenue in the Bronx. T. 87, 100–01, 128–29. Shortly thereafter, police officers Douglas Pace and Frank Longo proceeded to the Radcliffe Avenue address—a three story, five family apartment building—directly in front of which the assailants' Pontiac was parked. T. 101–02, 129, 259. The officers then parked their patrol car down the street so that—from inside the car—they could observe both the Pontiac and

---

**1.** Citations with the letter "T" refer to the trial transcript. Citations with the letter "S" refer to the transcript of Pilotti's sentencing on his murder conviction. Citations with the letter "H" refer to the transcript of the hearing on Pilotti's motion to vacate his murder conviction. Citations with the letters "OA" refer to the transcript

of the oral argument on Pilotti's petition for habeas corpus presently before the court.

**2.** Another witness testified that right after the incident, Correa described the perpetrators as "four Puerto Ricans." Correa, however, did not recall giving such a description. T. 73–76, 83.

the entrance to the building. T. 101–02, 129.

No one was seen either entering or leaving the building for approximately forty-five minutes. T. 103. Then, at 10:30 AM, the officers observed three men—Pilotti, Louis Giongetti, and Alfred Peruso—exit the building. T. 104–30. Pilotti, who was clean shaven and formally dressed in a black suit or tuxedo and carrying a white fur coat, walked directly to a taxicab which was waiting outside the building. T. 105, 118–19, 140. The other two, dressed casually, walked down the street in the other direction. T. 131–32, 146. The officers pulled their car in front of the taxicab, blocking its departure. T. 105–06, 131.

Longo went to the cab and Pace approached Giongetti and Peruso on the street. Longo opened the door to the cab and asked Pilotti to get out. Pilotti asked if he could get his coat which was on the back seat. Longo directed him to leave the coat and again ordered him out of the cab. Pilotti complied, without resisting, at which time Longo patted him down, finding no weapons. T. 107. After leaving Pilotti with a backup officer who had arrived at the scene, Longo went back to the cab to get Pilotti's coat, beneath which he discovered a loaded .357 Magnum Colt revolver wrapped in a towel. T. 107–08, 110. Pilotti, Giongetti, and Peruso were arrested and taken to the police station. T. 107.

At the station, two .38 caliber shell casings—later found to have been fired from the gun found under Pilotti's coat—were recovered from Giongetti's pants pocket. T. 135–36. Pilotti was booked for both possession of a weapon and attempted murder.[3] At that time, however, the district attorney's office sought and obtained an indictment only for possession of a weapon ("the gun case"). T. 694–95.

During pre-trial discovery on the gun case, the prosecutor provided defense counsel with two ballistics reports, both of which indicated that the gun was not linked to the Melendez murder. Further, the prosecutor assured Pilotti that no such link had been established. *People v. Pilotti,* 127 A.D.2d 23, 30, 511 N.Y.S.2d 248, 253 (1st Dep't 1987).

On February 28, 1978, following the denial of his suppression motion, Pilotti pled guilty to possession of a weapon in the third degree. N.Y. Penal Law § 265.02 (McKinney 1989). During his plea allocution, Pilotti admitted that he had possessed the loaded gun in the taxi. *Id.* at 24–25, 511 N.Y.S.2d at 249. As promised, he was sentenced to a term of imprisonment of two and one-half to five years, which was to run concurrently with a previously imposed sentence for an unrelated offense. Thus, by accepting the plea, Pilotti assured himself of no additional jail time. *Pilotti,* 127 A.D.2d at 24–25, 511 N.Y.S.2d at 249. Pilotti then unsuccessfully appealed his gun conviction, challenging the denial of his motion to suppress the gun. *People v. Pilotti,* 73 A.D.2d 846, 423 N.Y.S.2d 358 (1st Dep't 1979), *leave to appeal denied,* 49 N.Y.2d 895, 427 N.Y.S.2d 1033, 405 N.E.2d 243, *cert. denied,* 449 U.S. 870, 101 S.Ct. 209, 66 L.Ed.2d 90 (1980).

On December 21, 1979—just one day after the Appellate Division affirmed Pilotti's gun conviction—Pilotti and Giongetti were indicted for the Melendez murder. At the murder trial, the prosecution produced a third ballistics report, dated June 2, 1977, which concluded that the bullet from the deceased "matched" the gun recovered from Pilotti. The contents of this critical report were never disclosed to defense counsel prior to Pilotti pleading guilty to the gun possession charge. *Pilotti,* 127 A.D.2d at 31, 511 N.Y.S.2d at 253.

Prior to trial of the murder charge, Pilotti moved to preclude the use of his gun plea against him on the ground that, *inter alia,* the prosecution had withheld the June 2 ballistics report. Omnibus Motion Ind. No. 2775/79, Exh. 11 to Respondent's Affidavit and Memorandum of Law in Opposition ("Memo in Opposition"). The motion was denied. Order, April 4, 1980, Exh. 12 to Memo in Opposition. During the trial, Pilotti's attorney further argued that permitting impeachment with the gun plea—

---

**3.** Pilotti was only booked for "attempted" murder since Melendez had not yet died. T. 694.

which was later vacated—effectively precluded Pilotti from taking the stand on his own behalf and denying that he possessed the gun. T. 687–93. In response, the prosecutor stipulated that he would not impeach Pilotti with the gun conviction if Pilotti took the stand at trial. However, he did threaten to impeach Pilotti with the factual admissions he had made during the gun plea allocution if he were to testify that he never possessed the gun. T. 695–97. Pilotti chose not to testify on his own behalf and was convicted of murder in the second degree. It is this conviction for which Pilotti brings the present habeas corpus petition.

Pilotti then moved in the Supreme Court of New York to vacate his gun conviction pursuant to N.Y. C.P.L. § 440.10 (McKinney 1983), on the ground that the prosecutor had fraudulently induced him to accept the gun plea by failing to disclose the June 2 ballistics report linking the gun to the Melendez homicide. The court ordered a hearing on the motion, during which an internal memorandum from Sean Walsh, the Assistant District Attorney in charge of the gun case, to William Quinn, the chief of the homicide bureau, surfaced. In the memorandum, Walsh acknowledged the significance of the plea to the gun charge by noting that an acquittal would "collaterally have stopped us from introducing [the gun at a homicide trial]". Memorandum from Sean Walsh to William Quinn, dated March 2, 1978, at 2, Exh. 2 to Memo in Opposition. Further, Walsh noted that "the argument that we attempted to prove the homicide by bootstrapping the gun charge may very well be a case of first impression in this State." *Id.* After all the evidence was in, however, the hearing court found that there was no "fraud" on the part of the prosecution, and that Pilotti knew about the ballistics match before he pled guilty. Accordingly, Pilotti's motion to withdraw his plea was denied. H. 215.

On February 5, 1987, the Appellate Division reversed the hearing court's ruling,

vacated the plea and withdrew the sentence. In a very detailed opinion, the court held that the hearing court's finding that there was no fraud or misrepresentation was clearly erroneous. *Pilotti,* 127 A.D.2d at 28–29, 511 N.Y.S.2d at 252. The court found that Pilotti had indeed been "misled" by the prosecutor's withholding of the critical ballistics report, thus causing him to be "lured into the plea." *Id.* at 31, 511 N.Y. S.2d at 253. Pilotti was not prosecuted further on the gun charge and the indictment was voluntarily dismissed.[4]

On March 25, 1988, Pilotti moved—again in the Supreme Court of New York and pursuant to N.Y. C.P.L. § 440.10 (McKinney 1983)—to vacate his murder conviction. He argued, *inter alia,* that the prosecutor's threat of impeaching him with the fraudulently induced gun plea allocution "chilled" his constitutional right to testify on his own behalf at his murder trial. The motion was denied, "principal[y]" on the ground that the issue had been procedurally waived. The Appellate Division affirmed without opinion, *People v. Pilotti,* 148 A.D.2d 323, 538 N.Y.S.2d 889 (1st Dep't 1989), and the New York Court of Appeals denied Pilotti's application for leave to appeal. *People v. Pilotti,* 74 N.Y.2d 850, 546 N.Y.S.2d 1015, 546 N.E.2d 198 (1989).

## DISCUSSION

### A. Exhaustion

As a preliminary matter, the court notes that Pilotti has exhausted his state court remedies with regard to each of the four arguments set forth in his petition. *See* 28 U.S.C. § 2254(b), (c) (1988).

### B. The Threatened Impeachment With the Gun Plea

 Pilotti argues that his gun plea was coerced. Thus, he claims, the threatened use of his plea to impeach him, were he to take the stand at his murder trial and deny possessing the gun, "chilled" his right to

---

**4.** By the time the Appellate Division vacated the plea in the gun case, Pilotti had already completed his two and one-half to five year sentence. Thus, the District Attorney's office found the case to be moot. *People v. Pilotti,* Recommendation for Dismissal of Indictment No. 891/77, Exh. 7 to Memo in Opposition.

testify on his own behalf.[5] Memorandum of Law in Support of Petition for Writ of Habeas Corpus ("Memo in Support") 26. Respondent, on the other hand, claims that Pilotti's plea was in no way coerced or involuntary, and that therefore, by not testifying at trial, Pilotti has failed to preserve his claim for review. Memo in Opposition 17–18. Further, respondent argues that impeachment with the gun plea would have nevertheless been proper regardless of its later vacatur by the Appellate Division. *Id.* at 20–22. Lastly, respondent urges that any error found by this court should be deemed harmless. *Id.* at 17–23.

### (i) *The Gun Plea*

■ In its opinion, the Appellate Division made clear that it was vacating the gun plea pursuant to N.Y. C.P.L. § 440.10(1) (McKinney 1983), which provides that a judgment can be vacated if it was obtained by "duress, misrepresentation or fraud on the part of ... a prosecutor." The court noted that such a remedy lies to correct a judgment obtained by a plea which was procured by "trickery, deceit, coercion or fraud." *Pilotti*, 127 A.D.2d at 29, 511 N.Y. S.2d at 252. The court stated further that "[t]o deny a person an opportunity to be heard on proof that he was defrauded or coerced into pleading guilty to a crime would impair a constitutional right." *Id.* Accordingly, after finding that Pilotti was "misled" by the prosecutor's withholding of the critical ballistics report linking the gun to the murder, and that Pilotti was "lured into the plea by such conduct," the court vacated the conviction and withdrew the sentence.

Nevertheless, respondent disingenuously argues that Pilotti's plea was not coerced or in any other way involuntary. Further, respondent labels the prosecution's actions or omissions in the gun case as "at worst ... a discovery violation." Memo in Opposition 20; OA. 30. It is incredible that respondent takes such a position in light of the facts of this case and the findings of the Appellate Division in its opinion vacating the gun plea.[6] While the Appellate Division did not explicitly state that Pilotti's plea was "coerced" or "involuntary," it is obvious that it implicitly found so. Insofar as the history of this case may be said to be at all ambiguous—which it is not—this court explicitly finds that Pilotti's plea was in fact coerced and was therefore involuntary in violation of his Fifth and Fourteenth Amendment rights under the United States Constitution. *See Boykin v. Alabama*, 395 U.S. 238, 243 (1969); *Mabry v. Johnson*, 467 U.S. 504, 509 (1984) (a plea is involuntary if defendant is not "fully aware of the direct consequences," or if it is induced by "... *misrepresentation....*" (quoting *Brady v. United States*, 397 U.S. 742, 755 (1970) (emphasis added))).

### (ii) *Biller v. Lopes*

■ In *Biller v. Lopes*, 834 F.2d 41 (2d Cir.1987), the Second Circuit was faced with a case remarkably similar—both factually and procedurally—to the case at hand. The defendant in *Biller*, Meyer Biller, was charged with acting as a public adjuster without a license and interfering with police officer at the scene of a fire. At his trial in Connecticut state court ("Biller II"), Biller moved *in limine* and at the close of his case to preclude the use of a prior conviction ("Biller I") to impeach him were he to take the stand and testify. The motion was based on the fact that at the time of Biller II, the Biller I conviction was

---

**5.** A defendant's right to testify on his or her own behalf at a criminal trial is rooted in several provisions of the Constitution. It has sources in the Due Process Clause of the Fourteenth Amendment, the Compulsory Process Clause of the Sixth Amendment, and is a corollary to the Fifth Amendment's guarantee against compelled testimony. *Rock v. Arkansas*, 483 U.S. 44, 51–53, 107 S.Ct. 2704, 2708–2710, 97 L.Ed.2d 37 (1987).

A close review of Pilotti's memorandum of law indicates that his claim, more precisely, is

that the prosecutor made derivative use of coerced testimony in violation of the Fifth Amendment, *see Biller v. Lopes*, 834 F.2d 41 (2d Cir.1987), and that the Fifth Amendment violation had the effect of "chilling" his right to testify.

**6.** Since the findings of fact by the Appellate Division are fully supported by the record, they are presumed to be correct. *See* 28 U.S.C. § 2254(d) (1988); *Sumner v. Mata*, 449 U.S. 539 (1981).

on appeal in the Connecticut Supreme Court. The motion was denied and Biller, not having testified on his own behalf, was convicted. Thereafter, the Biller I conviction was reversed on the ground that it had been obtained with compelled statements made by Biller before an investigative grand jury in violation of his Fifth Amendment rights. On federal habeas review, the Second Circuit agreed with the district court's finding that the threatened impeachment with the unconstitutionally obtained Biller I conviction had prevented Biller from testifying in Biller II. Therefore, since " 'the State made derivative use of a conviction obtained in violation of the Fifth Amendment,' " the *Biller* court affirmed the district court's granting of the writ. 834 F.2d at 46 (quoting *Biller v. Lopes*, 655 F.Supp. 292, 305–06 (D.Conn.1987)).

Although *Biller* involved derivative use of compelled testimony before a grand jury and this case involves derivative use of a coerced plea allocution, this distinction is insignificant. Both cases involve the derivative use of involuntary statements obtained in violation of the Fifth Amendment. Accordingly, the only issue that remains to be decided is whether, but for the threatened impeachment with the coerced gun plea, Pilotti would have in fact taken the stand and testified that he never possessed the gun.[7] That such a determination needs to be made is inferred from the fact that in granting relief in *Biller*, the Second Circuit emphasized the district court's finding that Biller would have testified at Biller II had it not been for the threatened impeachment with his conviction in Biller I. *See* 834 F.2d at 44, 46; 655 F.Supp. at 300.

In this case, Pilotti has clearly established that, but for the threatened impeachment, he would have testified at his murder trial. *See* Defendant's Omnibus Motion and Affirmation of Mark A. Posner, Ind. No. 2775/79, dated March 17, 1980, Exh. 11 to Memo in Opposition (Pilotti's motion—which was denied—to suppress the gun plea allocution); T. 690–97 (trial counsel argues that failure to suppress the gun

plea precludes Pilotti from taking the stand and denying possession of the gun); S. 26 (Pilotti indicates that he intended to take the stand but that his attorney advised him not to); H. 88, 104 (Pilotti testifies that he never possessed the gun and that he would have testified at the trail had it not been for the threatened impeachment with the gun plea); OA. 18–19 (indicating that had it not been for the gun plea, Pilotti would have denied possession of the gun and put the credibility of the police officer at issue); Affidavit of Dominic (sic) Pilotti, sworn to August 25, 1987, ¶ 3, Exh. 1 to Petitioner's Supplemental Memorandum (Pilotti indicates that he would have testified had it not been for the threatened impeachment with the gun plea); Affirmation of Murray Richmond, dated September 14, 1987, ¶¶ 3, 4, Exh. 2 to Petitioner's Supplemental Memorandum (Pilotti's trial counsel indicates that Pilotti wanted to testify, and that he would have advised him to do so had it not been for the threatened impeachment with the gun plea). *See also,* H. 75, 104 (Pilotti testifies that he did not possess the gun); Transcript of October 23, 1980, 2–3, Exh. 4 to Petitioner's Supplemental Memorandum (trial court's ruling pursuant to *People v. Sandoval*, 34 N.Y.2d 371, 357 N.Y.S.2d 849 (1974), indicating that the prosecution would be prohibited from introducing any of Pilotti's prior convictions to impeach him were he to testify).

It is equally clear that the trial court's determination to the contrary is not fairly supported by the record. *See* Opinion, March 28, 1988, Exh. 17 to Memo in Opposition; 28 U.S.C. § 2254(d) (1988). To support its finding that, even had it not been for the threatened impeachment, there is "no possibility" that Pilotti would have taken the stand at trial and denied possession of the gun, the trial court quotes a similar finding by the dissent in the Appellate Division's vacatur of the gun plea. *Id.; Pilotti,* 127 A.D.2d at 58, 511 N.Y.S.2d at 270. The Appellate Division majority, however, explicitly found the dissent's "speculation" to be "without basis." 127 A.D.2d at 37, 511 N.Y.S.2d at 257. Further, given its

---

7. That this would have been Pilotti's testimony is obvious, since had he testified otherwise he

would not have been impeached with the gun conviction. *See* T. 695–97.

pre-trial *Sandoval* ruling, it is puzzling that the trial court—as well as Appellate Division dissent—relies heavily on the fact that Pilotti had several prior convictions in determining that he would not have testified. *Id.; Pilotti,* 127 A.D.2d at 58, 511 N.Y.S.2d at 270.

Accordingly, since the State made derivative use of Pilotti's coerced gun plea at his murder trial—i.e., the threatened impeachment prevented Pilotti from testifying—*Biller* mandates that his conviction be vacated.[8]

### (iii) *Pilotti's Failure to Testify*

■ Making the improper assumption that there was no Fifth Amendment violation in the procurement of Pilotti's gun plea and that, therefore, *Biller* is not controlling, respondent argues that Pilotti's failure to testify renders his claim unpreserved for review. In support of its position, respondent relies on *Luce v. United States,* 469 U.S. 38 (1984). In *Luce,* the Supreme Court held that in order to raise and preserve for review a claim of improper impeachment with evidence of a prior conviction, the defendant must take the stand and testify. However, *Luce* explicitly distinguished itself from cases in which Fifth Amendment violations operated to dissuade defendants from taking the stand. 469 U.S. at 42. Thus, respondent's reliance on *Luce*—which by its own language does not apply to this case—is misplaced. *See New Jersey v. Portash,* 440 U.S. 450 (1979); *Biller,* 834 F.2d 41.

### (iv) *Reliability of the Plea*

■ Further, respondent claims that had Pilotti taken the stand and denied possessing the gun, impeachment with his gun plea allocution would have nevertheless been proper, regardless of the later vacatur by the Appellate Division. Respondent relies on *Harris v. New York,* 401 U.S. 222 (1971), and *Oregon v. Hass,* 420 U.S. 714 (1975), both of which held that the use of reliable statements taken in violation of

*Miranda v. Arizona,* 384 U.S. 436 (1966), for impeachment purposes is permissible. *See also Walder v. United States,* 347 U.S. 62 (1954) (evidence obtained in violation of the Fourth Amendment can be used to impeach a defendant's credibility). The reasoning in *Harris* and *Hass,* however, does not apply to cases such as this, where the statements obtained were coerced or involuntary. *New Jersey v. Portash,* 440 U.S. 450, 458 (1979). It is well settled law that compelled or coerced testimony obtained in violation of the Fifth Amendment—regardless of its reliability—can not be used to impeach a defendant in a criminal trial. *Portash,* 440 U.S. at 459; *Biller,* 834 F.2d at 45. Accordingly, respondent's argument is not persuasive.

### (v) *Harmless Error*

■ Lastly, respondent argues that proof of Pilotti's possession of the gun in the taxi was overwhelming. Thus, since Pilotti would not have been impeached with the gun plea unless he had denied possessing the gun, respondent urges that any error found by this court should be deemed harmless. Memo in Opposition 22–23. In *Biller,* however, the Second Circuit held that harmless error analysis was inapplicable to such fundamental constitutional errors as impeachment with a conviction obtained by coerced testimony. 834 F.2d at 46 ("the constitutional violation in admitting compelled [or coerced] testimony for impeachment purposes is a matter of law, not an issue resting on factual consideration"). Therefore, under *Biller,* Pilotti's conviction must be vacated as a matter of law. *Id.*

The court must nevertheless continue its review of this case, since respondent would be barred from retrying Pilotti were he to prevail on any of the three remaining claims raised in his petition. *See Burks v. United States,* 437 U.S. 1 (1978) (sufficiency of the evidence); *United States v. Marion,* 404 U.S. 307 (1971) (pre-indictment delay).

---

**8.** Having found that Pilotti's conviction must be vacated under *Biller*'s Fifth Amendment "derivative use" analysis, the court need not decide whether the threatened impeachment also violated Pilotti's right to testify.

## C. Sufficiency of the Evidence

■ Pilotti argues that he was convicted on insufficient evidence in violation of his right to due process under the Fourteenth Amendment. *Jackson v. Virginia,* 443 U.S. 307, 315–18 (1979). The court agrees with the trial judge that sufficiency in this case is a "close question."[9] S. 9. Accordingly, Pilotti's claim will be scrutinized with particular care. *See United States v. Grunberger,* 431 F.2d 1062 (2d Cir.1970).

The test to determine the sufficiency of the evidence on federal habeas review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson* at 319 (emphasis in original). The jury may base its verdict solely upon circumstantial evidence and the evidence need not exclude every reasonable hypothesis of innocence.[10] *United States v. Oguns,* No. 90–1098, slip op. at 784 (2d Cir. December 17, 1990); *United States v. Barnes,* 604 F.2d 121, 156 (2d Cir.1979), *cert. denied,* 446 U.S. 907 (1980) (citations omitted).

In order to convict Pilotti—as it did—of murder in the second degree, the jury had to find that he intentionally caused the death of Melendez. N.Y. Penal Law § 125.25 (McKinney 1987). More precisely, the jury had to find not only that Pilotti was in the Pontiac at the time of the murder, but also that he was one of the two "shooters."[11] *See* T. 744, 915.

The evidence at trial, when viewed in the light most favorable to the government, established the following: 1) Pilotti possessed the murder weapon sixty to ninety minutes after the murder had occurred and approximately five blocks from the scene of the crime, 2) Pilotti had been in the Radcliffe Avenue building—where the owner of the Pontiac lived—for at least forty-five minutes prior to his arrest, 3) Pilotti was arrested in the company of Giongetti, who possessed two shell casings fired from the murder weapon. It is based upon this evidence that respondent argues a rational juror could have found Pilotti guilty of intentional murder.[12]

■ Admittedly, "a [criminal] defendant challenging the sufficiency of the evidence to support his conviction carries a heavy burden." *Oguns,* slip op. at 784 (citation omitted).[13] Pilotti, however, has met this

---

**9.** It is interesting to note that in response to Pilotti's double jeopardy argument raised on direct appeal from his murder conviction, respondent argued that it had delayed prosecution of the murder case because, according to the head of the homicide bureau, without an eyewitness there was "inadequate evidence ... connecting [Pilotti] to the murder." Respondent's Supplemental Brief 5, Exh. 14 to Memo in Opposition (citing Affidavit of William Andrew Quinn, dated March 11, 1980). Notably, no eyewitness or previously unknown evidence was ever produced at trial. Thus, it is the very same evidence which respondent previously thought was "inadequate" that it now argues proved guilt beyond a reasonable doubt.

**10.** Pilotti claims that there at least two "innocent" explanations for his possession of the murder weapon: 1) he was in the Pontiac at the time of the murder and was given the gun by the assailant or a third party, but did not participate in the shooting, and 2) he was not in the Pontiac at the time of the murder, and was later given the gun by the assailant or a third party. However, if the *Jackson* test is met, the fact that Pilotti hypothesizes these perfectly reasonable "innocent" scenarios would be irrelevant.

**11.** Since the prosecution's theory at trial was one of "acting in concert," it need not have proved that it was Pilotti who fired the fatal bullet.

**12.** Respondent argues that there was also evidence that Pilotti "refused to exit [the cab]" when asked to do so by Officer Longo, Memo in Opposition 7, and that Pilotti was "preoccup[ied] with his coat," *Id.,* thus evincing a "classic consciousness of guilt." *Id.* These two additional facts, however, are not supported by a fair reading of the record and to a certain extent are actually contradicted by the trial testimony. *See e.g.,* T. 124 (Officer Longo testifies that Pilotti made no attempt to resist).

Moreover, it is not disputed that Pilotti's guilt —i.e., he had the gun because he had just committed the murder—is consistent with the evidence. Such a scenario may in fact be accurate. To say that Pilotti's guilt is consistent with the evidence, however, is quite different from saying that a reasonable juror could have found him guilty beyond a reasonable doubt.

**13.** *Oguns* involved a challenge to the sufficiency of the evidence on direct appeal from a federal conviction. However, the standard for sufficiency on direct appeal from a federal conviction is identical to that set forth in *Jackson* concerning federal habeas review of a state conviction.

burden. After carefully reviewing all the evidence submitted to the jury in the light most favorable to the government, the court finds that no reasonable juror could have found Pilotti guilty of murder. Although the evidence certainly raises a suspicion about Pilotti's involvement in the murder, it was not of the magnitude such that a reasonable juror could have inferred—beyond a reasonable doubt—that Pilotti was one of the two gunmen in the Pontiac. *See United States v. Wiley*, 846 F.2d 150, 154 (2d Cir.1988) ("a suspicion or knowledge [of illegality] is not enough"); *United States v. Lewis*, 787 F.2d 1318 (9th Cir.1986) ("mere suspicion or speculation can not be the basis for [the] creation of logical inferences"). *See also*, T. 908 (Judge charges jury that it can not convict based on a suspicion). Accordingly, since the evidence against Pilotti was constitutionally insufficient, his conviction must be vacated. Further, respondent can not retry Pilotti since to do so would violate the Double Jeopardy Clause. *See Burks v. United States*, 437 U.S. 1 (1978).[14]

## CONCLUSION

For the reasons set forth above, the petition for a writ of habeas corpus is granted and the conviction is vacated. Further, since Pilotti can not be retried, it is ordered that he be released from custody. The order is stayed pending appeal on the condition that within seven days of the date of this order, respondent files a notice of appeal and a motion for an expedited schedule for the prosecution of the appeal.

So ordered.

---

14. Accordingly, the court need not address Pilotti's remaining arguments.