Matthew J. SOLOMON, Plaintiff,

v.

COMMISSIONER OF CORRECTIONAL SERVICES, Defendant.

No. CV 91–4411.

United States District Court, E.D. New York.

Feb. 28, 1992.

Schapiro & Reich by Perry S. Reich, Lindenhurst, N.Y., for plaintiff.

James, Catterson, Suffolk County Dist. Atty. by Mark D. Cohen, Hauppauge, N.Y., for defendant.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

On February 3, 1989, Matthew Solomon ("petitioner") was convicted of Murder in the Second Degree pursuant to New York Penal Law § 125.25[2], depraved mind murder. Having exhausted his state remedies, petitioner now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the following grounds: (1) there was insufficient evidence for a rational jury to have found this to be a case of depraved mind murder; (2) petitioner received ineffective assistance of counsel; and (3) the intense media coverage before and during the trial deprived petitioner of a fair trial. For the reasons discussed below, the petition is denied.

## I. BACKGROUND

On January 11, 1988, petitioner was arrested and charged with Murder in the Second Degree in violation of New York Penal Law § 125.25[1], intentional homicide, and § 125.25[2], depraved mind homicide, in connection with the Christmas Eve strangulation of his newlywed wife, 22 year old Lisa Solomon. Although the prosecutor strongly emphasized the count of intentional homicide in his opening and closing statements, on February 3, 1989, petitioner was convicted of depraved mind homicide and sentenced to an indeterminate term of eighteen years to life imprisonment.

### A. *Evidence Produced at Trial*

In assessing a claim of insufficiency of evidence, a federal habeas court is re-

quired to view the evidence in the light most favorable to the State. *Reddy v. Coombe*, 846 F.2d 866, 869 (2d Cir.), *cert. denied*, 488 U.S. 929, 109 S.Ct. 316, 102 L.Ed.2d 334 (1988). From that viewpoint, the following was established at trial:

On December 24, 1987, at about 7 o'clock in the evening, Lisa Solomon called her mother, Diane Weaver. Lisa appeared to be very happy. Soon afterwards, Lisa and Matthew Solomon began a Christmas Eve dinner during which they consumed three bottles of champagne. After dinner they made love and then, at approximately 10 o'clock, Lisa began watching a videotape and Matthew fell asleep.

Shortly before midnight, Lisa awakened Matthew. She was upset about Matthew falling asleep on Christmas Eve, about her father's recent ill health, and about her mother being alone. She said that she hated Matthew and that she was leaving.[1] Matthew began yelling.

Raymond Padilla, the Solomons' landlord and downstairs neighbor, heard petitioner's shouts, rising in intensity, coming from the Solomons' living room. He then heard the footsteps of one person apparently chasing another in the upstairs apartment, then a bang as if someone were being pinned against a wall, then Lisa crying, and then silence.

Petitioner admits that he put his right arm around Lisa's neck, applied a bar arm choke hold, and held it for "a few minutes." [People's Exhibit 65; R.S.A. 406–412].[2] When he knew his wife was dead, he removed her panties, moved the naked body to the bathroom, switched the positions of his and Lisa's cars in their driveway so that his car would be accessible, walked to a 7–Eleven store to purchase plastic garbage bags, removed his wife's diamond rings and replaced them with a plain gold band, wrapped the body in five garbage bags, placed it in the trunk of his car, and dumped it in the woods off Pulaski Road in Huntington, Suffolk County, New York.

Petitioner then drove around until approximately 5 o'clock in the morning, when he spotted Suffolk County Police Officer Robert Donohue. He asked the officer if he had seen Lisa, who, petitioner said, had gone out for a walk the previous evening but had not returned. When Donohue said that he had seen a woman walking alone, petitioner showed the officer a picture of Lisa.

Within hours, petitioner repeated his "missing person story" to his father, to Lisa's mother, to Kim Krug (a friend of Lisa's), to Padilla and to various police officers. He left a note in his apartment that said, "Dear Lisa, when you come home please don't go anywhere, wait for me to return. Love Matthew. I love you, Matthew." [T: 1869].

Petitioner helped organize and conduct a search for Lisa that was undertaken by Suffolk County Police and civilian volunteers. This search continued, attended by intense media coverage, until December 30, 1987, when Lisa's body was discovered at approximately 11:00 p.m. by Karl Heidenreich, one of the searchers. Petitioner arrived at the scene shortly thereafter, yelling, "Where is she? Let me see her!" [T: 2004]. His emotional reaction was apparently so intense that he had to be restrained, and he was subsequently taken by ambulance to Huntington Hospital where he was sedated.

Hair identified as petitioner's, and a fiber, consistent with that of the carpet in the trunk of petitioner's car were found inside the fourth garbage bag in which Lisa's body was wrapped.

On January 11, 1988, petitioner was arrested and properly informed of his *Miranda* rights. He waived these rights,

---

1. One of petitioner's versions of the night's events was that Lisa intended to take a car ride by herself and that he was trying to prevent her from doing so because she had too much to drink.

2. Numbers in brackets prefixed by the letter "T" refer to the pages of the trial transcript; numbers prefixed by the letter "H" refer to the pages of the pre-trial hearing; numbers prefixed by the letters R.S.A. refer to pages in Respondent's Appellate Division Supplemental Index, Exhibit A.

however, and made oral, written and video-taped confessions.[3]

Dr. Sigmund Menchel, the Suffolk County Medical Examiner who examined Lisa Solomon's body, found her tongue clenched in her mouth, hemorrhaging around her lips and in her eyes and face, swelling to her neck, and fractured cartilage in her neck. He concluded that she had been killed by strangulation through the use of a bar arm choke hold and that a tremendous amount of force was applied to the neck in order to cause the cartilage fracture. He testified that from the time petitioner applied the choke hold, Lisa's death could have occurred within as little as 20 to 60 seconds or as much as two or three minutes and that unconsciousness would have preceded death. He also found injuries to her scalp, shoulders, and left forearm that could have occurred as the result of banging her head against a wall.

In addition, Dr. Menchel stated that Lisa's blood alcohol level was 0.16 at the time of her death (making her legally drunk for purposes of operating a motor vehicle) and he estimated that she had consumed between six and eight drinks. However, he insisted that this level of alcohol consumption was not a contributing factor in her death.

Other evidence introduced at trial showed that Lisa was only five feet one inch tall while petitioner, a sheet metal worker, was approximately five feet ten inches tall. In addition, petitioner was well aware that Lisa was an asthmatic who took medicine for that condition twice a day. Finally, there was evidence of a struggle: scratch marks on petitioner's neck and chin, a bite mark on his right arm, and possibly blood on a gold chain that he wore around his neck.

## B. *Trial Preparations and Proceedings*

Petitioner's attorney was Jeffrey Waller, Esq., a practitioner with approximately 20 years of experience, including two and a half years as a Suffolk County Assistant District Attorney. Petitioner retained him for a "net fee" of approximately $110,000, with Waller paying all trial expenses from this fee.

Due to the extensive coverage of this case by the local media, petitioner moved for a change of venue prior to jury selection.[4] The motion was denied by the Appellate Division in an opinion that suggested that it would be more appropriate to file such a motion after the conclusion of the *voir dire*.

Upon petitioner's motion, the trial judge ordered special proceedings for *voir dire* pursuant to *People v. Ryan*, 93 A.D.2d 848, 461 N.Y.S.2d 344, 345 (2d Dep't 1983). Approximately 170 prospective jurors were screened, and 115 were individually questioned regarding their exposure to the pretrial publicity. The questioning of the prospective jurors, mostly by Waller, was extensive, filling more than 1,500 pages of the transcript. Although the entire jury pool had heard of the case, the twelve jurors and four alternates selected indicated that they would not be influenced by media reports, but would decide the case only on the evidence produced at trial. The judge instructed them not to watch media reports of the case or discuss it with anyone. Waller apparently believed that he had a fair panel; he used only 18 of his 20 peremptory challenges, declared himself satisfied with each juror selected, and he did not renew his motion for a change of venue.

During the trial, the intense media coverage continued. Over petitioner's objections, the court granted permission for live television coverage and Channel 12, a local cable station, recorded the entire trial. Moreover, in violation of "gag orders" issued by the judge, the prosecutor, Timothy Mazzei, conducted a press conference dur-

---

3. The oral confession was later suppressed due to the prosecutor's failure to give timely notice pursuant to C.P.L. § 710.30.

4. Petitioner was at least partly responsible for the media interest, giving several interviews to reporters prior to the discovery of his wife's body. On December 28, 1987, for example, he gave an interview to a syndicated television show, Long Island News Tonight.

ing trial. Channel 12 broadcast Mazzei's statements to the effect that petitioner was lying in his videotaped confession and that anyone who believed everything on that tape would be "awful[ly] gullible." [T: 2645].

Following summations, but before charging the jury, the court questioned each member of the jury regarding his or her exposure to media reports during the trial. None had seen the channel 12 broadcast of Mazzei's statements and each member indicated that he or she was following the judge's instructions to guard against exposure to media coverage of the trial. While a few jurors saw things such as headlines in Newsday or part of a television news broadcast that were related to the case, they all stated that they would be unaffected by such extrajudicial sources.

Following the completion of the trial, petitioner's application for relief pursuant to New York Criminal Procedure Law § 440.10 was denied by an order dated April 18, 1990, and leave to appeal that order was denied by an order dated May 18, 1990, and denied again on reargument and resubmission by an order dated August 30, 1990. The Appellate Division unanimously affirmed the judgment, *People v. Solomon,* 172 A.D.2d 781, 569 N.Y.S.2d 101 (2d Dep't 1991), and leave to appeal to the Court of Appeals was denied. *People v. Solomon,* 78 N.Y.2d 975, 574 N.Y.S.2d 954, 580 N.E.2d 426 (1991).

## C. *Petitioner's Claims*

Petitioner's claims at this time are as follows:

1. Insufficient evidence was presented for a rational jury to have found this to be a case of depraved mind murder; the jury must have improperly considered petitioner's actions subsequent to Lisa's death in order to find the necessary depravity.

2. Petitioner received ineffective assistance of counsel because Waller: (a) took a vacation sometime before the commencement of trial rather than spend that additional time in trial preparation; (b) had a conflict of interest with his client as a result of his "net fee" arrangement and therefore failed to call a necessary expert

witness; (c) failed to renew his motion for a change of venue after the completion of the *voir dire;* (d) failed to move for the suppression of an admission by Solomon on the grounds of illegal detention; (e) failed to effectively impeach Padilla's testimony through the use of inconsistent statements; (f) and, in general, failed to present a coherent defense strategy as is evidenced by his weak opening and closing statements.

3. Petitioner failed to receive a fair trial as a result of: (a) extensive pre-trial publicity; (b) live television coverage of the trial; and (c) improper statements made by the prosecutor at a press conference during the trial.

## II. DISCUSSION

### A. *Insufficient Evidence of Depraved Mind Murder*

■ A federal habeas court will not review the sufficiency of evidence underlying a State criminal conviction unless the record is "so totally devoid of evidentiary support that a due process issue is raised." *Mapp v. Warden, N.Y. State Corr. Inst. for Women,* 531 F.2d 1167, 1173 n. 8 (2d Cir.), *cert. denied,* 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976); *United States ex rel. Terry v. Henderson,* 462 F.2d 1125, 1131 (2d Cir.1972). The test to determine the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Reddy v. Coombe,* 916 F.2d 47, 52 n. 1 (2d Cir.1990) (applying standard to a habeas petitioner's *mens rea*); *Pilotti v. Superintendent, Great Meadow Corr. Fac.,* 759 F.Supp. 1031, 1038 (S.D.N.Y.1991).

■ Under New York law, a conviction for depraved mind homicide must be supported by evidence that "[u]nder circumstances evincing a depraved indifference to human life [defendant] recklessly en-

gage[d] in conduct which create[d] a grave risk of death to another person, and thereby cause[d] the death of another person." N.Y.P.L. § 125.25[2]. Thus, to establish petitioner's guilt, the prosecution was required to prove that petitioner's act presented a very high risk of death to Lisa Solomon, and that it was committed under circumstances which evinced a callous or wanton indifference to human life or a depravity of mind. *People v. Gomez*, 65 N.Y.2d 9, 489 N.Y.S.2d 156, 158, 478 N.E.2d 759, 761 (Ct.App.1985); *People v. Poplis*, 30 N.Y.2d 85, 330 N.Y.S.2d 365, 366, 281 N.E.2d 167, 168 (Ct.App.1972).

Petitioner does not now suggest that his use of a bar arm choke hold on his wife did not present a grave risk of death. He argues, however, that the only evidence of depraved behavior in this case relates to his acts subsequent to his wife's death ("subsequent acts") and that this Court should therefore modify his conviction to a lesser crime such as Manslaughter in the Second Degree, N.Y.P.L. § 125.15[1], reckless manslaughter. *See People v. Roe*, 74 N.Y.2d 20, 544 N.Y.S.2d 297, 300 & n. 7, 542 N.E.2d 610, 613 & n. 7 (Ct.App.1989) (evidence of defendant's emotional state subsequent to shooting is not relevant to his "depraved indifference"); *People v. Kibbe*, 35 N.Y.2d 407, 362 N.Y.S.2d 848, 851–52, 321 N.E.2d 773, 775–76 (Ct.App. 1974), *reversing Second Circuit and affirming Court of Appeals, Henderson v. Kibbe*, 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). Indeed, petitioner contends that his subsequent acts are irrelevant to a homicide charge even if he were not certain that his wife was dead at the time of those subsequent acts. *Cf. People v. Dlugash*, 41 N.Y.2d 725, 395 N.Y.S.2d 419, 423, 363 N.E.2d 1155, 1158 (Ct.App. 1977) (shooting into body that may have already been dead will not sustain a charge of murder).

The sole required *mens rea* for both depraved mind murder and reckless manslaughter is recklessness. *People v. Register*, 60 N.Y.2d 270, 469 N.Y.S.2d 599, 603, 457 N.E.2d 704, 708 (Ct.App.1983), *cert. denied*, 466 U.S. 953, 104 S.Ct. 2159, 80 L.Ed.2d 544 (1984). "[D]epraved mind murder is distinguishable from manslaughter, not by the mental element involved but by the objective circumstances in which the act occurs...." *Id.* "Depraved indifference" is not an additional element, but serves "to objectively define the circumstances which must exist to elevate a homicide from manslaughter to murder." *Id.* 469 N.Y.S.2d at 602, 457 N.E.2d at 708. It may be established by the actor's extreme cruelty, "the helplessness of the victim, the lack of provocation for the conduct or the prolonged period over which it occurs." *People v. Lilly*, 71 A.D.2d 393, 422 N.Y.S.2d 976 (4th Dep't 1979); *see People v. France*, 57 A.D.2d 432, 394 N.Y.S.2d 891 (1st Dep't 1977).

"[T]he assessment of the objective circumstances evincing the actor's depraved indifference to human life ... is a qualitative judgment to be made by the trier of facts." *Roe*, 544 N.Y.S.2d at 299, 542 N.E.2d at 612; *Register*, 469 N.Y.S.2d at 601, 457 N.E.2d at 706; *see People v. Santana*, 163 A.D.2d 495, 558 N.Y.S.2d 172 (2d Dep't 1990), *aff'd* 78 N.Y.2d 1027, 576 N.Y.S.2d 208, 582 N.E.2d 591 (1991); *People v. LeGrand*, 61 A.D.2d 815, 402 N.Y.S.2d 209 (2d Dep't 1978), *cert. denied*, 439 U.S. 835, 99 S.Ct. 117, 58 L.Ed.2d 130 (1978).

Respondent notes that the depraved indifference required in N.Y.P.L. § 125.25[2] is generalized, and need not be specifically directed at the victim. *See, e.g.*, A. Hechtman, 39 *Practice Commentaries, McKinney's Cons. Law of New York*, Penal Law, § 125.25[2] (depraved mind murder committed by shooting into a crowd, placing a time bomb in a public place or opening the door of a lion's cage in a zoo). Moreover, evidence of a defendant's conduct and emotional state after the commission of a crime may be relevant to showing his "consciousness of guilt." *People v. Benzinger*, 36 N.Y.2d 29, 364 N.Y.S.2d 855, 324 N.E.2d 334 (Ct.App. 1974); *see People v. Levine*, 65 N.Y.2d 845, 493 N.Y.S.2d 290, 482 N.E.2d 1206 (Ct.App. 1985). Furthermore, such conduct can show subjective awareness of the risk,

thereby establishing the *mens rea* of recklessness. *Roe*, 544 N.Y.S.2d at 300 n. 7, 542 N.E.2d at 613 n. 7.

■ However, petitioner's point is unrefuted: respondent is unable to cite any authority for the proposition that the required depravity may be satisfied by acts subsequent to the victim's death, nor does he explain how, in this case, petitioner's subsequent acts could reveal his subjective awareness of the risk. Consequently, this Court will exclude all subsequent act evidence from its sufficiency of evidence analysis.

■ Nevertheless, even without considering petitioner's subsequent acts, ample evidence was presented by the prosecution to refute petitioner's contention that no rational finder of fact could have found the requisite elements of depraved mind murder beyond a reasonable doubt. Such evidence consists of the medical examiner's expert testimony regarding the tremendous force petitioner applied to the neck of his much smaller, weaker, and asthmatic victim—force which he applied for up to three minutes, and which he continued to apply even after his wife lost consciousness.[5]

■ Petitioner contends that because there is no way of determining whether or not the jury improperly considered subsequent act evidence, its "verdict must be set aside [since] it could be supported on one ground but not on another, and the reviewing court was uncertain which of the two grounds were relied upon by the jury in reaching its verdict." *Mills v. Maryland*, 486 U.S. 367, 376, 108 S.Ct. 1860, 1866, 100 L.Ed.2d 384 (1988); *Yates v. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957); *Stromberg v. California*, 283 U.S. 359, 367, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931). However, in *Griffin v. United States*, —— U.S. ——, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), the Supreme Court recently explained that the holding in

*Stromberg* and its progeny is applicable only when one of the possible bases for conviction was *legally* inadequate. It is inapplicable to a claim like this one for insufficient evidence to support the jury's verdict.

Finally, petitioner relies on *McCormick v. United States*, —— U.S. ——, 111 S.Ct. 1807, 1815 n. 8, 114 L.Ed.2d 307 (1991) and *United States v. Schwartz*, 924 F.2d 410, 418 (2d Cir.1991) for the proposition that a conviction cannot be sustained on a theory never presented to the jury. However, these cases are also inapposite. In the instant case, the Suffolk County Grand Jury indicted petitioner on depraved mind murder, the prosecutor presented that theory in his closing arguments, and the judge properly charged the jury as to its elements.

Petitioner has failed to prove that the jurors improperly relied upon evidence of his subsequent acts to find the required depravity. *See Swain v. Alabama*, 380 U.S. 202, 226–27, 85 S.Ct. 824, 839–40, 13 L.Ed.2d 759 (1965) (petitioner in a habeas petition has the burden of proof); *Polizzi v. United States*, 926 F.2d 1311, 1321 (2d Cir.1991) (same). Accordingly, petitioner's insufficient evidence claim is denied.

### B. *Ineffective Assistance of Counsel*

Petitioner acknowledges that a claim of ineffective assistance of counsel is often made, but is seldom meritorious. Petitioner's arguments to the contrary, the instant claim is typical.

■ In order to successfully assert that he received ineffective assistance of counsel, petitioner must establish that (1) his counsel's performance fell below an objective standard of reasonableness; and (2) "there is a reasonable possibility that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*,

---

5. Petitioner insists that the disparity of strength between himself and the victim is irrelevant to the issue of depravity. This Court disagrees. It seems obvious that although the application of a bar arm choke hold will always create a risk of death, that risk increases when the victim is substantially weaker than the actor. *Cf. Light v. State of Indiana*, 547 N.E.2d 1073, 1082–83 (Sup. Ct.Ind.1989) (affirming maximum sentence in intentional murder case based on evidence of victim's disability and defendant's superior strength).

**226**

466 U.S. 668, 687, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984); *see United States v. Reiter,* 897 F.2d 639, 645 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 59, 112 L.Ed.2d 34 (1990). Although the habeas court must make an independent review of the evidence, *Kimmelman v. Morrison,* 477 U.S. 365, 378, 106 S.Ct. 2574, 2584, 91 L.Ed.2d 305 (1986); *Shaw v. Scully,* 654 F.Supp. 859, 865 (S.D.N.Y.1987), "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence...." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.; see Mills v. Scully,* 826 F.2d 1192, 1197 (2d Cir.1987) (same).

Petitioner claims that he received ineffective assistance of counsel because, *inter alia,* his attorney took a vacation sometime before the commencement of trial rather than spend that additional time in trial preparation; failed to call a necessary expert witness (possibly because of his "net fee" arrangement); failed to renew his motion for a change of venue after the completion of the *voir dire;* failed to timely move for the suppression of an admission by Solomon in a *Dunaway* hearing; failed to effectively impeach Padilla's testimony through the use of inconsistent statements; and, in general, failed to present a coherent defense strategy as is evidenced by his weak opening and closing statements.

Most of these claims fail the first part of the *Strickland* test which examines whether counsel's performance was deficient under the totality of the circumstances. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. The remainder, even assuming a failure to meet professional norms (and this Court does not make such a finding), fail the second part of the *Strickland* test which requires demonstrating prejudice. *Id.* at 693, 104 S.Ct. at 2067.

■ First, counsel's performance, viewed in its totality, was "objectively reasonable." A partial list of counsel's efforts on behalf of petitioner includes: motion for pre-trial discovery, including requests for particularization of the charges and *Brady* material; motion to dismiss the indictment; *Huntley* motion to suppress admissions made to the police; successful motion to preclude oral admissions which were not properly noticed pursuant to C.P.L. § 710.-30; *Sandoval* motion to preclude prior criminal and immoral acts; motion for a change of venue; motion for individual questioning of jurors in chambers during *voir dire* and for additional peremptory challenges; extensive questioning of prospective jurors; motion to preclude evidence relating to petitioner's conduct subsequent to the homicide; motions for a mistrial based on an alleged violation of the court's preclusion order and on prosecutorial misconduct; numerous objections on various grounds to the prosecutor's offers of evidence (including a successful objection to the introduction of a videotape of the discovery of Lisa's body); numerous objections to the prosecutor's examination of witnesses; lengthy and aggressive cross-examination of prosecution witnesses; direct examination of three defense witnesses; introduction of fifteen exhibits; and opening and closing arguments with the consistent theme that the death of Lisa Solomon was a tragic accident, not a murder. Although petitioner's counsel undoubtedly made certain errors, this record indicates that viewed in the context of the entire record, he did a reasonable job. *See Kimmelman,* 477 U.S. at 386, 106 S.Ct. at 2588; *Wise v. Smith,* 735 F.2d 735, 738–39 (2d Cir.1984) (petitioner not entitled to a perfect defense). It also indicates that Waller's pre-trial vacation notwithstanding, he was adequately prepared for trial. *See Jones v. Estelle,* 622 F.2d 124, 127 (5th Cir.1980) (that counsel only met with his client one time before trial does not prove ineffective assistance), *cert. denied,* 449 U.S. 996, 101 S.Ct. 537, 66 L.Ed.2d 295 (1980).

With the advantage of hindsight, petitioner discusses various alleged errors made by Waller. They do not, however, add up to a violation of petitioner's Sixth

Amendment right to effective counsel. *See United States v. Cruz,* 785 F.2d 399, 405 (2d Cir.1986) (warning against use of hindsight in challenge to counsel's trial conduct) (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065).

### 1. Failure to Renew Motion for a Change of Venue

■ Although the extensive media coverage prior to trial prompted Waller to file a voluminous motion for a change of venue, he did not renew that motion after the completion of the *voir dire* as the Appellate Division suggested by its citation of *People v. Boudin,* 87 A.D.2d 133, 451 N.Y.S.2d 153 (2d Dep't 1982). Petitioner's present counsel now concludes that this is an example of Waller's incompetence.

Considering, however, the extensive *voir dire* conducted by Waller and the fact that he exercised only 18 peremptory challenges and voiced his consent to each jury member selected, this Court finds it more likely that Waller knew (at least after his motion for a change of venue was denied) that he could have renewed that motion after the *voir dire,* but he decided that a change of venue was not necessary. *See Trapnell v. United States,* 725 F.2d 149, 155 (2d Cir.1983) (habeas court should not "second guess matters of trial strategy simply because the chosen strategy was not effective"); *People v. DiPiazza,* 24 N.Y.2d 342, 300 N.Y.S.2d 545, 550, 248 N.E.2d 412, 415 (Ct.App.1969) (defendant cannot complain of denial of motion for change of venue when his counsel did not use all his peremptory challenges and declared himself satisfied with each juror selected).

### 2. Failure to Move for Dunaway Hearing

■ Waller failed to move, pursuant to *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), to suppress admissions that petitioner made to police officers at the time of his arrest, nor did Waller seek permission to reopen the issue pursuant to C.P.L. § 710.40(4) and *People v. Cohen,* 58 N.Y.2d 844, 460 N.Y.S.2d 18, 19 n. *, 446 N.E.2d 774, 775 n.

* (Ct.App.), *cert. denied,* 461 U.S. 930, 103 S.Ct. 2092, 77 L.Ed.2d 302 (1983). "In order to show ineffective assistance for the failure to make a suppression motion, the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed." *United States v. Matos,* 905 F.2d 30, 32 (2d Cir.1990) (citing *Kimmelman,* 477 U.S. at 375–76, 106 S.Ct. at 2582–83); *see LiPuma v. Commissioner, Dept. of Corr.,* 560 F.2d 84, 93 (2d Cir.) (it is sufficient that counsel exercised "professional discretion"), *cert. denied,* 434 U.S. 861, 98 S.Ct. 189, 54 L.Ed.2d 135 (1977); *Curzi v. United States,* 773 F.Supp. 535, 544 (E.D.N.Y.1991) (same).

In the instant case, although counsel's failure to make a *Dunaway* motion was apparently an error rather than an exercise in professional discretion, *see* [H: 82–85, 100], petitioner has failed to state any basis on which such a motion would have a likelihood of success. *See United States v. DiTommaso,* 817 F.2d 201, 215 (2d Cir. 1987). Furthermore, considering the forensic evidence and the testimony of Padilla and others, there is ample evidence to support the verdict even if petitioner's admissions had been suppressed.

### 3. Failure to Impeach Padilla with Inconsistent Statements

■ Waller failed to impeach Padilla through the use of inconsistent statements on the issue of whether, on the night of the homicide, he heard only petitioner's voice raised in anger, or also Lisa Solomon's. Apparently, Waller incorrectly believed that he could explore this issue through the hearsay testimony of Detective Dennis Delaney to whom Padilla had spoken. Respondent counters that Waller cross-examined Padilla at great length, specifically questioned him about what he did and did not hear, and did use *Rosario* material as part of that cross-examination. *See* [T: 1789–1820].

In any event, assuming Waller could have made better use of available *Rosario* material, this error caused no prejudice to

petitioner. It is clear that petitioner and his wife argued before the homicide. Petitioner's acts would be no less culpable whether Lisa had conversed in shouts or whispers.

### 4. Failure to Call an Expert Witness on Petitioner's Post–Traumatic Stress

Petitioner's next claim is that Waller failed to call an expert witness on the subject of post-traumatic stress disorder to explain petitioner's acts subsequent to his wife's death. Respondent counters that petitioner's first two witnesses, the Emergency Medical Technician and the emergency room surgeon who treated him on the night his wife's body was discovered, both testified that they believed petitioner was in emotional shock due to stress or grief at that time.

Moreover, petitioner's reliance on *Maddox v. Lord*, 818 F.2d 1058 (2d Cir.1987) is inapposite because the potential witness in *Maddox* was prepared to testify that the defendant "was extremely emotionally disturbed *prior to,* and *during,* the commission of the crime." *Id.* at 1061 (emphasis added). As discussed in section II.A. *supra,* petitioner's emotional state *after* he killed his wife is not relevant to the issue of his guilt of depraved mind homicide. Consequently, any expert testimony regarding petitioner's emotional state at that time would have been irrelevant. *See United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.) ("decision whether to call any witnesses ... is a tactical decision of the sort engaged in by defense attorneys in almost every trial"), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987).[6]

### 5. Failure to Present a Coherent Defense Strategy

Finally, petitioner contends that Waller failed to present a coherent defense strategy. He notes that Waller admitted, both in his opening and closing statements, that petitioner was the instrument of his wife's death and he suggests that Waller was remiss for failing to place greater emphasis on a theory of accident or emotional stress.

However, even the complete waiver of an opening statement in conjunction with a brief summation will not generally be considered proof of ineffective assistance of counsel. *See Nersesian*, 824 F.2d at 1321. Indeed, where defense counsel is faced with overwhelming evidence of his client's guilt, including the client's confession, it is not ineffective assistance of counsel to submit that defendant to the mercy of the jury. *People v. Mapp*, 47 N.Y.2d 939, 419 N.Y.S.2d 947, 393 N.E.2d 1020 (Ct.App.1979); *Rickenbacker v. Warden*, 550 F.2d 62, 66 (2d Cir.1976) (brief closing argument held sufficient), *cert. denied,* 434 U.S. 826, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977).

Moreover, as discussed above, petitioner's emotional stress after the homicide was not a relevant issue and Waller did stress a theory of accidental death throughout the trial.[7] Counsel can hardly be called ineffective for using the word "tragedy" rather than "accident" in addressing the jury.

Accordingly, petitioner's claim that he received ineffective counsel is denied.

### C. *Media Coverage Deprived Petitioner of a Fair Trial*

Petitioner's final claim is that the media coverage of this case, coupled with improper remarks made by the prosecutor at a press conference during the trial, deprived him of a fair trial as guaranteed by the Due Process Clause of the Fourteenth Amendment. However, as the Appellate Division noted, " '[n]o matter how desirable it may be, it is unrealistic to expect and require jurors to be totally ignorant prior to trial of the facts and issues in certain

---

6. Although this Court does not express approval for Waller's "net fee" arrangement, in many respects his defense was thorough and time-consuming; there is no indication that his trial strategy was influenced by a desire to save money.

7. Dr. Mark Taff, a pathologist retained by the defense, testified that the force applied to Lisa Solomon's neck was not great and, partly due to her consumption of alcohol, she died in less than a minute. *See* [T: 2735–2752].

cases.' " *Solomon*, 569 N.Y.S.2d at 102 (quoting *People v. Culhane*, 33 N.Y.2d 90, 350 N.Y.S.2d 381, 400, 305 N.E.2d 469, 482 (Ct.App.1973). "Indeed, it seems well settled that pre-trial publicity, even if pervasive and concentrated, does not necessarily lead to an unfair trial." *Boudin*, 451 N.Y.S.2d at 155 (citing *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 565, 96 S.Ct. 2791, 2805, 49 L.Ed.2d 683 (1976)).

■ As discussed above, after an extensive *voir dire* in which counsel did not exhaust his peremptory challenges and expressed his satisfaction with each juror selected, petitioner did not renew his motion for a change of venue. Moreover, the jurors all expressed their ability to decide the case solely on the evidence presented at trial and, after summations, they stated that they had been following the judge's instructions to guard against exposure to the media. None of them had seen the broadcast of the prosecutor's mid-trial press conference. Consequently, petitioner has not shown that he was denied a fair trial because of the media coverage of this case. *See Mu'Min v. Virginia*, —— U.S. ——, 111 S.Ct. 1899, 1907, 114 L.Ed.2d 493 (1991) ("trial court's finding of juror impartiality may 'be overturned only for manifest error' ") (quoting *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984)). Accordingly, petitioner's claim that he was deprived of a fair trial as a result of the media coverage is denied.

## III. CONCLUSION

This Court has also examined petitioner's remaining contentions and finds them to be without merit. For the aforementioned reasons, petitioner's motion for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied.

SO ORDERED.